# PURCHASE AND SALE OF ASSETS AGREEMENT

Among

BURNSVILLE SANITARY LANDFILL, INC.

and

USA WASTE SERVICES, INC.

and

EDWARD KRAEMER & SONS, INC.

EXHIBIT 1
Affidavit of
Erin K. Fogarty Lisle

TABLE OF CONTENTS


SECTION PAGE

ARTICLE 1. SALE OF ASSETS . . . . . . . . . . . . . . . . . . . . 2
Section 1.1. Description of Assets . . . . . . . . . . . 2
Section 1.2. Excluded Assets . . . . . . . . . . . . . . 4
Section 1.3. Non-Assignment of Certain Customer Contracts . . . . . . . . . . . . . . . . . . . . . 4
Section 1.4. Accounts Receivable . . . . . . . . . . . . 4
Section 1.5. Proration of Prepayments . . . . . . . . . 5

ARTICLE 2. PURCHASE PRICE . . . . . . . . . . . . . . . . . . . 6
Section 2.1. Purchase Price . . . . . . . . . . . . . . 6
Section 2.2. Additional Deferred Purchase Price . . . . 6
Section 2.3. Agreed Value of USA Waste Stock . . . . . 7

ARTICLE 3. CLOSING . . . . . . . . . . . . . . . . . . . . . . . 7
Section 3.1. Time and Place of Closing . . . . . . . . 7
Section 3.2. Deliveries by Seller . . . . . . . . . . . 7
Section 3.3. Deliveries by Buyer . . . . . . . . . . . 9
Section 3.4. Owners Policy Commitment . . . . . . . . . 10
Section 3.5. Permitted Encumbrances . . . . . . . . . . 10
Section 3.6. Survey . . . . . . . . . . . . . . . . . . 10
Section 3.7. Prorations and Charges . . . . . . . . . . 11

ARTICLE 4. POST CLOSING COVENANTS . . . . . . . . . . . . . . . 11
Section 4.1. Change of Name . . . . . . . . . . . . . . 11
Section 4.2. Further Assurance . . . . . . . . . . . . 12
Section 4.3. Transition . . . . . . . . . . . . . . . . 12
Section 4.4. Discontinuance of Composting Operation . . 12

ARTICLE 5. REVIEW PERIOD . . . . . . . . . . . . . . . . . . . . 13
Section 5.1. Review Period Activities . . . . . . . . . 13
Section 5.2. Transfer of Permits . . . . . . . . . . . 14

ARTICLE 6. REPRESENTATIONS AND WARRANTIES OF SELLER . . . . . 14
Section 6.1. Organization; Authority . . . . . . . . . 15
Section 6.2. Stock Ownership; Binding Effect . . . . . 16
Section 6.3. Predecessor Entities; Trade Names . . . . 16
Section 6.4. No Subsidiaries . . . . . . . . . . . . . 16
Section 6.5. Financial Statements . . . . . . . . . . . 16
Section 6.6. Non-Balance Sheet Liabilities . . . . . . 18
Section 6.7. Proprietary Rights . . . . . . . . . . . . 18
Section 6.8. Personal Property . . . . . . . . . . . . 19
Section 6.9. Title to Real Property . . . . . . . . . . 20
Section 6.10. Contracts . . . . . . . . . . . . . . . . 21
Section 6.11. Insurance Policies . . . . . . . . . . . 22
Section 6.12. Employees; Compensation . . . . . . . . . 22
Section 6.13. Employee Relations and Benefit Plans . . 22
Section 6.14. Gross Revenues . . . . . . . . . . . . . 23
Section 6.15. Compliance with Law; No Conflicts . . . . 23
Section 6.16. Taxes . . . . . . . . . . . . . . . . . . 24
Section 6.17. Litigation . . . . . . . . . . . . . . . 25
Section 6.18. Absence of Price Renegotiation

SECTION PAGE

Contracts . . . . . . . . . . . . . . . . . . . . . . 25
Section 6.19. Conduct of Seller's Business Since Balance Sheet Date . . . . . . . . . . . . . . . . . . . 25
Section 6.20. Hazardous Materials . . . . . . . . . . . . . 26
Section 6.21. Underground Storage Tanks . . . . . . . . . 27
Section 6.22. Corrupt Practices . . . . . . . . . . . . . 27

ARTICLE 7. REPRESENTATIONS AND WARRANTIES OF BUYER AND USA WASTE . . . . . . . . . . . . . . . . . . . . . . . 28
Section 7.1. Corporate Organization . . . . . . . . . . . 28
Section 7.2. USA Waste Stock . . . . . . . . . . . . . . 28
Section 7.3. Corporate Authority . . . . . . . . . . . . 28
Section 7.4. No Conflicts . . . . . . . . . . . . . . . . 29
Section 7.5. Public Announcement . . . . . . . . . . . . 29
Section 7.6. Binding Agreement . . . . . . . . . . . . . 29

ARTICLES 8. COVENANTS OF SELLER PRIOR TO CLOSING . . . . . . . 29
Section 8.1. Access to Land and Records . . . . . . . . . 29
Section 8.2. Activities of Seller Prior to Closing . . 30
Section 8.3. Prohibited Activities Prior to Closing . . 31
Section 8.4. Haul Tech . . . . . . . . . . . . . . . . . 31

ARTICLE 9. CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER . . 32
Section 9.1. Representations and Warranties . . . . . . 32
Section 9.2. Consents . . . . . . . . . . . . . . . . . . 32
Section 9.3. USA Waste Stock . . . . . . . . . . . . . . 32
Section 9.4. No Adverse Proceeding . . . . . . . . . . . 32
Section 9.5. Noncompetition Agreements . . . . . . . . . 33
Section 9.6. Opinion of Counsel . . . . . . . . . . . . . 33
Section 9.7. Methane Gas Property Leasehold . . . . . . . 33
Section 9.8. Covenants . . . . . . . . . . . . . . . . . . 33
Section 9.9. Cover Material . . . . . . . . . . . . . . . 33
Section 9.10. Environmental Condition; Title to Land . 33

ARTICLE 10. CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER . . 34
Section 10.1. Representations and Warranties . . . . . . 34
Section 10.2. Covenants . . . . . . . . . . . . . . . . . 34
Section 10.3. No Adverse Proceeding . . . . . . . . . . . 34
Section 10.4. No Adverse Change . . . . . . . . . . . . . 35
Section 10.5. General Release . . . . . . . . . . . . . . 35
Section 10.6. Consents . . . . . . . . . . . . . . . . . . 35
Section 10.7. Good Standing Certificates . . . . . . . . 35
Section 10.8. Opinion of Counsel . . . . . . . . . . . . 36
Section 10.9. Noncompetition Agreements . . . . . . . . . 36
Section 10.10. Updated Agreements . . . . . . . . . . . . 36
Section 10.11. Transferability of Permits . . . . . . . 36
Section 10.12. Environmental Review . . . . . . . . . . . 36
Section 10.13. Survey . . . . . . . . . . . . . . . . . . 37
Section 10.14. Expansion Permits . . . . . . . . . . . . 37
Section 10.15. Cover Material . . . . . . . . . . . . . . 37

SECTION PAGE

Section 10.16. Electric Transmission Lines . . . . . . . 37
Section 10.17. Private Roadway Access . . . . . . . . . . 37
Section 10.18. Methane Gas Property Leasehold . . . . . 37
Section 10.19. Title Policy . . . . . . . . . . . . . . . 38
Section 10.20. General . . . . . . . . . . . . . . . . . 38

ARTICLE 11. NON-ASSUMPTION OF LIABILITIES . . . . . . . . . . 38
Section 11.1. Non-Assumption of Liabilities . . . . . . 38
Section 11.2. Assumption of Specific Obligations . . . 39

ARTICLE 12. INDEMNIFICATION . . . . . . . . . . . . . . . . 41
Section 12.1. Survival of Representations, Warranties and Covenants . . . . . . . . . . . . . . . . . . . . 41
Section 12.2. Indemnification by Seller . . . . . . . . 41
Section 12.3. Indemnification by Buyer and USA Waste . 42
Section 12.4. Limitation on Seller's Liability for Certain Obligations . . . . . . . . . . . . . . . . 43
Section 12.5. Procedure for Indemnification with Respect to Third Party Claims . . . . . . . . . . . . 44

ARTICLE 13. TERMINATION OF AGREEMENT . . . . . . . . . . . . 46
Section 13.1. Termination by Buyer . . . . . . . . . . . 46
Section 13.2. Termination by Seller . . . . . . . . . . 46
Section 13.3. Termination by Any Party . . . . . . . . 46
Section 13.4. Effect of Termination . . . . . . . . . . 47

ARTICLE 14. NONDISCLOSURE OF CONFIDENTIAL INFORMATION . . . 47
Section 14.1. Nondisclosure by Seller . . . . . . . . . 47
Section 14.2. Nondisclosure by Buyer . . . . . . . . . 48

ARTICLE 15. FEDERAL SECURITIES ACT RESTRICTIONS ON STOCK . . 48
Section 15.1. Registered Stock . . . . . . . . . . . . . 48
Section 15.2. Compliance with Law . . . . . . . . . . . 49
Section 15.3. General Legend . . . . . . . . . . . . . . 49

ARTICLE 16. GENERAL . . . . . . . . . . . . . . . . . . . . 49
Section 16.1. Certain Definitions . . . . . . . . . . . 49
Section 16.2. Assignment; Binding Effect; Amendment . . 50
Section 16.3. Obligations of Buyer and USA Waste . . . 50
Section 16.4. Third Party Beneficiary . . . . . . . . . 54
Section 16.5. Entire Agreement. . . . . . . . . . . . . 54
Section 16.6. Counterparts . . . . . . . . . . . . . . . 54
Section 16.7. No Brokers . . . . . . . . . . . . . . . . 54
Section 16.8. Expenses of Transaction . . . . . . . . . 54
Section 16.9. Notices . . . . . . . . . . . . . . . . . 55
Section 16.10. Governing Law . . . . . . . . . . . . . . 56
Section 16.11. Appointment of Agent . . . . . . . . . . 56
Section 16.12. No Waiver . . . . . . . . . . . . . . . . 56
Section 16.13. Time of the Essence . . . . . . . . . . . 57
Section 16.14. Captions . . . . . . . . . . . . . . . . . 57

SECTION PAGE

Section 16.15. Severability . . . . . . . . . . . . . . . . 57
Section 16.16. Construction . . . . . . . . . . . . . . . . 57
Section 16.17. Standstill Agreement . . . . . . . . . . . . 58
Section 16.18. Interest; Costs of Litigation . . . . . . 58

# PURCHASE AND SALE OF ASSETS AGREEMENT

THIS PURCHASE AND SALE OF ASSETS AGREEMENT (the "Agreement") is executed and delivered as of March 19, 1997, among **BURNSVILLE SANITARY LANDFILL, INC.**, a Minnesota corporation ("Buyer"); **USA WASTE SERVICES, INC.**, a Delaware corporation ("USA Waste"); and **EDWARD KRAEMER & SONS, INC.**, a Wisconsin corporation ("Seller").

**WHEREAS**, Seller owns and operates a fully permitted solid waste landfill known as the Burnsville Sanitary Landfill (the "Landfill") located in Dakota County, Minnesota and more fully described on Exhibit A attached hereto and made a part hereof (the "Land");

**WHEREAS**, an affiliate of Seller, Haul Tech, LLC, conducts a waste collection and transportation business ("Haul Tech Business");

**WHEREAS**, Seller also conducts a quarry business, and a bridge construction business, each in the Burnsville, Minnesota area, none of which are being acquired by Buyer (the "Excluded Businesses");

**WHEREAS**, Buyer, a wholly owned subsidiary of USA Waste Services, Inc., a Delaware corporation ("USA Waste"), incorporated on February ___, 1997, desires to purchase and acquire certain assets, properties and contractual rights of Seller used in connection with the Landfill (but not the Excluded Businesses) and Seller desires to sell such assets, properties and contractual rights to Buyer, all in accordance with the terms and conditions set forth in this Agreement; and

**WHEREAS**, Buyer wishes to acquire and Seller wishes to have Buyer acquire the Haul Tech Business contemporaneously with Buyer's acquisition of the Landfill and Land, but under a separate agreement;

**NOW, THEREFORE**, in consideration of the mutual promises and covenants herein contained and other good and valuable consideration, received to the full satisfaction of each of them, the parties hereby agree as follows:

## ARTICLE 1. SALE OF ASSETS

Section 1.1. Description of Assets. Upon the terms and subject to the conditions set forth in this Agreement, Seller hereby grants, conveys, sells, transfers and assigns to Buyer the following assets, properties and contractual rights of Seller, wherever located, subject to the exclusions hereinafter set forth:

(a) the Land and all buildings, fixtures and improvements located thereon;

(b) any governmental permit, license, authorization or approval which is a precondition to, regulates or governs the lawful operation of the Landfill and uses and activities on the Land (the "Permits");

(c) the equipment used or for use in the Landfill and owned or leased by Seller (the "Equipment") as listed on Schedule 1.1(c), attached hereto and made a part hereof;

(d) all of the motor vehicles used or for use in the Landfill and owned or leased by Seller, and all attachments, accessories and materials handling equipment now located in or on such motor vehicles (the "Rolling Stock"), as the same are more completely described by manufacturer, model number and model year on Schedule 1.1(d), attached hereto and made a part hereof;

(e) the manual and automated billing systems and components thereof, computer hardware, software and programs used or for use in the Landfill listed on Schedule 1.1(e), attached hereto and made a part hereof;

(f) all of Seller's inventory of parts, tires and accessories of every kind, nature, and description used or for use with the Equipment or Rolling Stock (the "Inventory");

(g) all right, title and interest of Seller in and to all trade secrets, proprietary rights, symbols, trademarks, service marks, logos and trade names used exclusively in connection with the Landfill and owned by Seller;

(h) all contractual rights of Seller with Seller's customers (whether oral or in writing) relating to the operation of the Landfill (but not the Excluded Businesses)

(the "Customer Contracts"), and all commitments, lists, leases, permits, licenses, consents, approvals, franchises and other instruments relating to the Customer Contracts (the "Related Approvals"); a complete and accurate list of the Customer Contracts and the Related Approvals shall be furnished to Buyer by Seller during the Review Period (hereinafter defined);

(i) all right, title and interest of Seller in and to the name "Burnsville Sanitary Landfill" in the State of Minnesota and the right to use such name and all similar names (the "Business Name");

(j) all right, title, and interest of Seller in and to each and any telephone number used exclusively in connection with the operation of the Landfill;

(k) all of Seller's shop tools, nuts and bolts relating to the Landfill;

(l) all of Seller's right, title and interest under the contract with Minnesota Methane LLC (the "Methane Contract") dated May 1, 1994, entitled "Agreement to Provide a Landfill Gas Collection System and Electrical Generation System" (including all rights to the federal landfill gas credits resulting therefrom which accrue after the Closing Date);

(m) all of Seller's right, title and interest under the lease with Northwest Bituminous Maintenance, Inc. dated January 1, 1995 (the "Northwest Lease");

(n) a leasehold interest in the real property owned by Seller and currently occupied by Minnesota Methane under the Methane Contract (the "Methane Gas Property Leasehold");

(o) all Seller's right, title and interest under the Trust Agreement, dated November 15, 1989, entered into by Seller as Grantor and First Bank National Association, the Trustee, whereunder the beneficiary is the Minnesota Pollution Control Agency (herein "MPCA Trust"); and

(p) all of the goodwill of the Landfill.

All of the foregoing assets, properties and contractual rights are hereinafter sometimes collectively called the "Assets."

Section 1.2. Excluded Assets. The parties agree that there shall be excluded from the Assets the following which are not being sold to Buyer pursuant to this Agreement (the "Excluded Assets"): (a) all cash on hand and on deposit of Seller, except as set forth in Section 1.5 hereof; (b) all accounts receivable of Seller including those related to the Landfill ("Seller's Accounts Receivable") as of the close of business on the date of Closing (hereinafter defined); (c) all, if any, real property and all buildings on and fixtures to all real property of Seller other than as set forth in Section 1.1(a); (d) all contracts and contract rights and obligations of Seller (whether oral or in writing) other than the Customer Contracts and the Permits and all commitments, lists, leases, permits, licenses, consents, approvals, franchises and other instruments not relating to the Customer Contracts, the Permits or the Landfill; (e) all employment contracts to which Seller is a party or by which Seller is bound; (f) the corporate records and corporate seal of Seller; (g) all motor vehicles of Seller which are not Rolling Stock; and (h) all of the assets, rights, liabilities and obligations related to the Haul Tech Business (to be covered by separate agreement) and the Excluded Businesses.

Section 1.3. Non-Assignment of Certain Customer Contracts. Notwithstanding anything to the contrary in this Agreement, to the extent that the assignment hereunder of any Customer Contract shall require the consent of any third party, neither this Agreement nor any action taken pursuant to its provisions shall constitute an assignment or an agreement to assign if such assignment or attempted assignment would constitute a breach thereof or result in the loss or diminution thereof. A complete and accurate list of all Customer Contracts requiring consent to their assignment shall be furnished to Buyer by Seller during the Review Period and attached hereto as Schedule 1.3. Seller shall obtain each required consent prior to Closing.

Section 1.4. Accounts Receivable. (a) Buyer shall have no liability or obligation whatsoever to Seller in connection with the Seller's Accounts Receivable and Buyer shall not be

responsible to Seller in any way for collection of the Seller's Accounts Receivable except for routine invoicing and rebilling in accordance with Buyer's standard practices. However, if Buyer receives any payments applicable to the Seller's Accounts Receivable, then Buyer shall forward such payments to Seller. Funds received by Buyer shall be credited against the oldest unpaid invoice of each customer and paid over to Seller until Seller's Accounts Receivable owing by such customer are paid, unless otherwise specified by the customer in writing.

(b) Seller shall make no attempt to collect any of the Seller's Accounts Receivable related to the Landfill after the Closing Date (hereinafter defined) for a period of 90 days. Thereafter Seller may take action to collect any of Seller's Accounts Receivable not collected during such 90-day period.

(c) Attached hereto as Schedule 1.4 is a true and complete list of all Seller's Accounts Receivable including an aging of all accounts and notes receivable as of December 31, 1996, showing amounts due in 30 day aging categories. At the Closing, Seller shall provide an updated list of Seller's Accounts Receivable as of the last day of the month immediately prior to the Closing Date. Except to the extent reflected on Schedule 1.4, Seller believes that each account and note receivable is collectible in the full amount shown on Schedule 1.4.

<u>Section 1.5</u>. <u>Proration of Prepayments</u>. The parties shall prorate, as of the close of business on the Closing Date, all sums paid to Seller pursuant to the advance billing practice of Seller or otherwise representing a prepayment to Seller of services to be rendered by Buyer after the Closing. Seller shall be entitled to all such sums allocable to services performed on or before the close of business on the date of Closing and Buyer shall be entitled to all such sums allocable to services to be performed thereafter.

ARTICLE 2. PURCHASE PRICE

Section 2.1. Purchase Price. At the Closing, USA Waste shall pay to Seller for the Assets: (A) the sum of $7,500,000 in immediately available funds; and (B) that total number of shares of the common stock of USA Waste, $0.01 par value per share (the "USA Waste Stock"), which shall have an aggregate Agreed Value (hereinafter defined) of $5,500,000.

Section 2.2. Additional Deferred Purchase Price. (a) In addition to the consideration payable pursuant to Section 2.1 above, USA Waste shall pay to Seller additional consideration for the Assets as follows:

(i) the sum of $500,000 shall be due and payable on the first anniversary of the Closing Date; and

(ii) the sum of $10,000,000 shall be due and payable in five equal annual payments of $2,000,000 each commencing on the second anniversary of the Closing Date and continuing on each anniversary date thereafter until said $10,000,000 is paid.

(b) The parties agree that each of the payments set forth in (a) above shall consist of principal and interest in accordance with the amortization table, which shall be attached hereto at Closing as Annex I.

(c) In the event that USA Waste shall fail to pay any amount required by this Section 2.2 within 30 days after written notice of such failure from Seller, Seller may, at its option and without notice, declare the entire balance then outstanding under this Section 2.2 to be immediately due and payable in full. Any amounts which are not paid within 30 days after such notice shall bear interest as set forth in Section 16.18 hereof from the due date to the date of payment. USA Waste shall be liable to Seller for the expenses incurred by Seller, including reasonable actual attorneys fees, to collect after default from USA Waste the amounts owing to Seller under this Section in accordance with Section 16.18.

Section 2.3. Agreed Value of USA Waste Stock. For purposes of this Agreement, the "Agreed Value" per share of USA Waste Stock shall be the average of the closing prices of a share of USA Waste Stock on the New York Stock Exchange, Inc. as reported in *The Wall Street Journal* for the five business days immediately preceding the five business days immediately prior to the Closing Date, adjusted for any stock splits, stock dividends and other capital changes between the first date of the valuation period and the Closing Date.

**ARTICLE 3. CLOSING**

Section 3.1. Time and Place of Closing. Unless otherwise agreed to by the parties hereto, this transaction shall be closed on the date that is seven business days after the completion, satisfaction or waiver of each of the conditions to closing set forth in Articles 8 and 9 (the "Closing"). The Closing shall take place at the offices of Larkin, Hoffman, Daly & Lindgren, 7900 Xerxes Avenue South, Bloomington, Minnesota 55431. The date on which the Closing occurs shall be referred to as the "Closing Date."

Section 3.2. Deliveries by Seller. At the Closing, Seller shall deliver to Buyer, all duly executed:

(a) a general warranty deed (the "Deed") to the Land subject only to the Permitted Encumbrances (hereinafter defined);

(b) the commitment for an Owner's Policy provided for below;

(c) the Survey provided for below;

(d) a General Conveyance, Assignment and Bill of Sale in form and substance satisfactory to Buyer and Seller, conveying, selling, transferring and assigning to Buyer all of the Assets (other than the Land) (the "Bill of Sale");

(e) an assignment and assumption of the Methane Contract and the Northwest Lease containing, or together with, the consent of the third party if required;

(f) the Methane Gas Property Leasehold providing for a term which continues so long as the Methane Contract continues, for rent in the amount of $2,000 per month commencing on the first day of the ~~sixtieth~~ thirty-sixth month after the month in during which the Closing occurs and containing such other terms as are mutually acceptable to Buyer and Seller;

(g) the governmental consents and approvals and other requirements under any statute, rule, regulation or policy of any governmental authority under Environmental Laws or which relate to the Permits or to the operation of the Landfill or to the uses of and activities on the Land (said statues, rules, regulations and policies being herein referred to collectively as the "Regulations"), which need to be obtained and satisfied prior to the date of the Closing to allow Buyer to succeed to the position of Seller in reference to the Permits, as owner and operator of the Landfill ("Governmental Transfer Requirements");

(h) all motor vehicle Certificates of Title and registrations to the Rolling Stock;

(i) certified copies of resolutions of the shareholders and directors of Seller authorizing the execution of this Agreement, the sale of the Assets to Buyer, and the consummation of the transactions contemplated herein, along with an incumbency certificate of Seller;

(j) a noncompetition agreement duly and properly executed by Seller, in form and substance satisfactory to Buyer and Seller (the "Seller Noncompetition Agreement");

(k) a noncompetition agreement duly and properly executed by David R. and Paula Schuette Kraemer in form and substance satisfactory to Buyer (the "Kraemer Noncompetition Agreement") (the Seller Noncompetition Agreement and Kraemer Noncompetition Agreement are hereinafter collectively referred to as the "Noncompetition Agreements");

(l) fully executed consents, if and as required, to the assignment of the Customer Contracts set forth on Schedule 1.3 in form and substance satisfactory to Buyer;

(m) evidence of the payment in full of all debts encumbering the Assets, including, without limitation, all obligations under any leases for any of the Assets (including any lease end buy out provisions);

(n) the documents required by Section 4.1 concerning the Business Name; and

(o) such other separate instruments of sale, assignment, or transfer reasonably requested by Buyer to fully effectuate the intentions of the parties under this Agreement.

Section 3.3. Deliveries by Buyer. At the Closing, Buyer and USA Waste, as the case may be, shall deliver to Seller, all duly and properly executed (where applicable):

(a) the purchase price provided in Section 2.1;

(b) the USA Waste Stock provided in Section 2.1;

(c) certified copies of resolutions of the directors and shareholder of Buyer and a certified copy of the corporate authorization of USA Waste, authorizing the execution and delivery of this Agreement and the consummation of the transactions contemplated herein, along with an incumbency certificate of Buyer and of USA Waste;

(d) the Noncompetition Agreements;

(e) an assignment and assumption of the Methane Contract and the Northwest Lease containing, or together with, the consent of the third party if required;

(f) the Methane Gas Property Leasehold providing for a term which continues so long as the Methane Contract continues, for rent in the amount of $2,000 per month commencing on the first day of the ~~sixtieth~~ thirty-sixth month after the month in during which the Closing occurs and containing such other terms as are mutually acceptable to Buyer and Seller;

(g) the Noncompetition Agreements duly and properly executed by Buyer; and

(h) such other separate instruments of sale, assignment, or transfer reasonably requested by Seller to fully effectuate the intentions of the parties under this Agreement.

<u>Section 3.4</u>. <u>Owners Policy Commitment</u>. Seller shall furnish to Buyer a commitment for an owners policy of title insurance from a reputable title insurance company (the "Title Company") licensed to do business in the State of Minnesota and approved by Buyer in the amount of $11,000,000, insuring title to the Land to be in fee simple in Buyer subject only to such exceptions as are acceptable to Buyer or otherwise permitted by Section 3.5 hereof (the "Owners Policy Commitment"). The Owners Policy Commitment shall include copies of all exception instruments referenced therein, and any unrecorded leases, option agreements, contracts and any other items affecting title which are in the possession of, or known to, Seller. Such commitment and other documents shall be provided to Buyer at least 15 business days before the Closing.

<u>Section 3.5</u>. <u>Permitted Encumbrances</u>. The Owners Policy Commitment shall insure Buyer's interest in the Land to be free and clear of all encumbrances whatsoever except: (i) municipal and zoning ordinances and regulations; (ii) real estate taxes and assessments, both general and special, which are a lien but are not yet due and payable at the Closing Date; (iii) easements, encumbrances, covenants, conditions, reservations and restrictions either of record or disclosed to Buyer prior to Closing, if any, as have been approved in writing by Buyer prior to the Closing Date; and (iv) the Northwest Lease. Seller shall pay all of the costs associated with the delivery of the Owners Policy to Buyer. Buyer shall pay for any cost of comprehensive, access, contiguity, going concern, zoning or other special endorsements which the Title Company adds to the Owners Policy Commitment at Buyer's request.

<u>Section 3.6</u>. <u>Survey</u>. Seller shall obtain for Buyer's use and for the use of the Title Company in connection with the issuance of the Owners Policy Commitment, a current and complete survey of the Land, made on the ground by a competent registered surveyor, showing: (a) the exact boundary lines of the Land; (b) the location thereon of all, if any, buildings, improvements, roads, and easements now existing; (c) the number of acres in the Land; (d) the location of any buildings, fences or other

improvements which encroach on the Land; (e) the location of any improvements on the Land which encroach on any neighboring property; (f) all building lines established in respect of the Land; and (g) all public access to the Land, and representing that the boundaries of the Land are contiguous with the boundaries of all adjoining parcels (the "Survey"). At least 15 business days before the Closing, a copy of the Survey complying with the above requirements shall be delivered to Buyer and the Title Company, together with certification to each entity by the surveyor, which certification complies with American Land Title Association guidelines, and also together with such additional supporting reports and other certificates as the Title Company may require to enable the Title Company to delete its corresponding standard survey exceptions from the Owner's Policy. Seller shall pay all of the costs of the Survey.

Section 3.7. Prorations and Charges. (a) The parties shall prorate and apportion, on a calendar year basis, as of the close of business on the date of Closing, the real estate taxes and assessments, both general and special, for the Land, based upon the last available tax duplicate. If the actual real estate taxes paid by Buyer in respect of the period of the proration differ from the credit given Buyer at closing for such taxes, the party benefitting shall, upon presentation of appropriate paid tax bills, reimburse the other for any amounts that such taxes differ from the prorated credit.

(b) Seller shall be charged the following closing costs: (i) the state and local real estate transfer taxes and conveyance fee; (ii) the cost of discharging any and all mortgages on the Land.

## ARTICLE 4. POST CLOSING COVENANTS

Section 4.1. Change of Name. On the date of Closing, Seller shall take all necessary action to cease use of the Business Name and any other symbol, tradename, service mark, logo or trade name now used by Seller exclusively in respect to the Landfill business. Seller shall, on the date of Closing, deliver to Buyer

in form suitable for filing, such certificates, consents and other documents as are necessary to effect the transfer of the registration of the Business Name conveyed to Buyer pursuant to this Agreement in Minnesota and shall grant any consents and take any other and further action, all at Seller's own expense, requested by Buyer to enable Buyer to reserve or register any such name for use of Buyer.

Section 4.2. Further Assurance. From time to time on and after the Closing and without further consideration, the parties hereto shall each deliver or cause to be delivered to any other party at such times and places as shall be reasonably requested, such additional instruments as any of the others may reasonably request for the purpose of carrying out this Agreement and the transaction contemplated hereby. Seller, also without further consideration, agrees to cooperate with Buyer and to use its reasonable efforts to have the officers and employees of Seller cooperate on and after the Closing Date in furnishing to Buyer information, evidence, testimony, and other assistance in connection with obtaining all necessary permits and approvals and in connection with any actions, proceedings, arrangements or disputes of any nature with respect to matters pertaining to all periods prior to the Closing Date. Buyer agrees to reimburse Seller for the reasonable out-of-pocket costs of such assistance.

Section 4.3. Transition. Seller will not take any action that is designed or intended to have the effect of discouraging any customer or business associate of Seller from maintaining the same business relationships with Buyer after the Closing that it maintained with Seller before the Closing. Seller will refer all customer inquiries relating to the Landfill to Buyer from and after the Closing. Further, Seller agrees that for a period of 90 days following the Closing Date, it will, without additional consideration, assist Buyer with the orderly transition of the operations of the Landfill from Seller to Buyer.

Section 4.4. Discontinuance of Composting Operation. Within 180 days after the Closing Date, Seller shall close down the operation of the composting business currently being run by Seller

on land adjacent to the Landfill. Pending such discontinuation, Buyer shall make available to Seller for its retained use the Equipment which Seller utilized at the execution of this Agreement in connection with the composting business and listed on Schedule 4.4 hereof ("Composting Equipment"). During the period of its retained use, Seller shall, at its expense, insure the Composting Equipment against the normal hazards, perform all regular maintenance and, upon the ceasing of the composting operation, return the Composting Equipment to Buyer in good operating condition, reasonable wear and tear excepted.

**ARTICLE 5. REVIEW PERIOD.**

Section 5.1. Review Period Activities. (a) The parties agree that there is substantial historical information existing which bears on the environmental condition (hereinafter defined) of the Land, the Permits and the Regulations (such information being hereinafter collectively referred to as the "Historical Information"). Buyer and Seller agree to work together on an ongoing basis throughout the Review Period (hereinafter defined) to identify and list the Permits and the Historical Information. Buyer and Seller shall agree on and jointly keep a record and copies of the Permits and the Historical Information which shall be incorporated herein at Closing as Annex II as if fully attached hereto.

(b) In addition, Buyer shall have the right during the Review Period to examine and test the Land in accordance with Section 8.1 hereof. All such testing shall be at the sole cost of Buyer and shall either be nondestructive or Buyer shall promptly repair any damage caused by such testing. Further, Buyer shall leave the Land in materially the same condition and repair as it was prior to any such testing. Buyer agrees to keep the Land free from liens relating to or arising out of any such testing and agrees to be completely responsible for all acts and omissions of itself, its agents, representatives and independent contractors in exercising the

rights and privilege granted in this Section and in Section 8.1.

(c) During the Review Period, Seller shall have the right to submit to Buyer in written form any information concerning the Environmental Condition of the Land or the Permits or the Regulations or any written commentary on anything stated or implied in the Historical Information ("Seller's Supplementary Information and Commentary"). Seller's Supplementary Information and Commentary shall be assembled and maintained by both Buyer and Seller as part of the Historical Information.

Section 5.2. Transfer of Permits. During the Review Period, Buyer and Seller shall jointly identify the Governmental Transfer Requirements and make a mutual determination of all matters of strategy in regard to satisfying the Governmental Transfer Requirements. Following such identification and the determination of strategy, Buyer and Seller shall together pursue the satisfaction of Governmental Transfer Requirements. In connection with the foregoing, Buyer and Seller shall each use their best efforts to make contact with the appropriate governmental agencies and officials having information about or jurisdiction over Seller, the Land, the Assets or the obligations or rights of Seller related the operation of the Landfill, including, without limitation, environmental and land use agencies and officials.

**ARTICLE 6. REPRESENTATIONS AND WARRANTIES OF SELLER.** Seller represents and warrants to Buyer that the statements contained in this Article 6: (i) except as set forth in the schedules to the subsections of this Article 6 delivered by Seller to Buyer on the date hereof (such schedules hereinafter collectively referred to as the "Disclosure Schedules" and, individually, as a "Disclosure Schedule") are correct and complete as of the date of this Agreement; (ii) will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the date of this Agreement throughout this Section

6); and (iii) shall survive the Closing in accordance with Section 12.1 hereof. The warranties by Seller set forth in this Article shall inure solely to Buyer and not to any successor or assigns of Buyer and shall not extend to any matter which is disclosed by the Historical Information or which is within the knowledge of Buyer at the end of the Review Period. Seller, with the exception of the express warranties set forth in this Article 6, hereby disclaims and negates any representation or warranty of any kind, whether express or implied, relating to the Environmental Condition of the Land (which Buyer will otherwise accept as is on the Closing Date), or relating to the Permits or Regulations.

Wherever a representation or warranty herein is qualified as having been made "to the best of Seller's knowledge", such phrase shall mean the actual knowledge of the current officers, directors and employees of Seller involved in the operation of the Assets, based on their personal recollection without inquiry. As used in this Agreement, the phrase "disclosed by the Historical Information" includes matters stated and shown within the Historical Information and matters which may be reasonably inferred from matters stated and shown by professionals knowledgeable in Environmental Laws, Environmental Conditions, and the Permits and the Regulations.

Section 6.1. Organization; Authority. (a) Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Wisconsin, is authorized to do business in Minnesota and is now and has been at all times since its incorporation, duly authorized, and qualified and licensed under all laws, regulations, ordinances and orders of public authorities to carry on its businesses in such other places and in the manner as conducted at the time such activities were conducted except for where failure to be so authorized, qualified or licensed would not have a material adverse affect on Seller's business. Copies of Seller's Articles of Incorporation (certified by the Secretary of State of Wisconsin) and Bylaws (certified by the Secretary of Seller), each as amended, are attached hereto as Schedule 6.1.

(b) Seller has full legal right, power and authority to enter into this Agreement and to consummate the transactions contemplated by this Agreement. All corporate action of Seller necessary to approve the sale of the Assets by Seller has been taken, including director and shareholder approvals, if necessary.

Section 6.2. Stock Ownership; Binding Effect. The authorized capital stock of Seller consists solely of 2,250 shares of Class A (voting) common stock and 22,250 shares of Class B (nonvoting) common stock of which 21 shares of Class A and 11,583 of Class B are issued and outstanding. All of the issued and outstanding shares of Seller are owned of record and beneficially by David R. Kraemer and are free and clear of all liens, security interests, encumbrances, adverse claims, pledges, equities and other restrictions whatsoever which would prohibit the sale of the Assets to Buyer. This Agreement is the valid and binding obligation of Seller enforceable against it in accordance with its terms.

Section 6.3. Predecessor Entities; Trade Names. Set forth on Schedule 6.3 is a list of the names of all predecessors of Seller, all prior corporate names of Seller and all trade names and "doing business names" of Seller, including the names of all entities substantially all of the assets of which were previously acquired by Seller.

Section 6.4. No Subsidiaries. Except for Haul Tech, LLC, Seller has never owned or controlled and does not now own, of record or beneficially, or control, directly or indirectly, any capital stock, securities convertible into capital stock or any other equity interest in any corporation, association, partnership or other business entity that affects the operation of the Landfill.

Section 6.5. Financial Statements. Attached as Schedule 6.5 are copies of the following financial statements (together, the "Financial Statements"):

(a) Seller's audited balance sheet as of March 31, 1996 (the "Balance Sheet Date"), and a statement of income, cash flow and retained earnings for the year then ended;

(b) Seller's internally prepared balance sheet as of March 31, 1996, and a statement of income for the year then ended reflecting solely the operation of the Landfill; and

(c) Seller's internally prepared monthly interim balance sheets and statements of income reflecting solely the operation of the Landfill, commencing for the month ended April 31, 1996, and continuing for each month end until the month ended immediately prior to the Closing Date.

Except as set forth on Schedule 6.5 and any information contained in the Historical Information, the Financial Statement (including any footnotes thereto) listed in clause (a) above has been prepared in accordance with GAAP, applied on a consistent basis throughout the periods indicated, including, without limitation, FASB92. Each of the Financial Statements (including all footnotes thereto) is true, complete and correct. Each of the balance sheets presents fairly the financial condition of Seller (or the operation of the Landfill, as applicable) as of the date indicated thereon and each of such statements of income presents fairly on an accrual basis the results of the operation of Seller (or the operation of the Landfill, as applicable) for the period indicated thereon. The Financial Statement listed in clause (a) above includes all footnotes required by GAAP, each such footnote is complete and accurate, and contains all information required by GAAP to be contained therein. All reserves for contingent risks have been estimated in accordance with GAAP and are appropriate and sufficient to cover all costs reasonably expected to be incurred from such risks. Seller has not during its last three fiscal years (a) made any material change in its accounting policies or (b) effected any prior period adjustment to, or other restatement of, its financial statements for any period. The Financial Statements are consistent with the books and records of Seller (which books and records are correct and complete).

Section 6.6. Non-Balance Sheet Liabilities. Attached hereto as Schedule 6.6 is a complete and accurate list as of the date hereof of all liabilities and obligations of Seller related to the operation of the Landfill, excluding obligations arising under this Agreement and any information contained in the Historical Information, which are not individually reflected in the Financial Statements dated the Balance Sheet Date, but which would have been so reflected in a full GAAP accounting (whether or not incurred in the ordinary course of business) of any kind, character and description, whether known or unknown, accrued or unaccrued, absolute or contingent, secured or unsecured, liquidated or unliquidated, due or to become due, together with, in the case of those liabilities and other obligations the amounts of which are not fixed, a reasonable best estimate of the maximum amount which may be payable. For each liability or obligation for which the amount is not fixed or is contested, Seller shall provide the following information:

(i) a summary description of the liability or other obligation together with the following:

(a) copies of all relevant documentation relating thereto;

(b) amounts claimed and any other action or relief sought; and

(c) name of claimant and all other parties to the claim, suit or proceeding, if any.

(ii) the name of each court or agency before which a claim, suit or proceeding is pending;

(iii) the date such claim, suit or proceeding was instituted;

(iv) a reasonable best estimate by Seller of the maximum amount, if any, which is likely to become payable with respect to each such liability or the cost of performance with respect to each such other obligation.

Section 6.7. Proprietary Rights. Attached as Schedule 6.7 is a complete and accurate list and summary description as of the date hereof of all motor vehicle titles and current

registrations, fuel permits, franchises, trademarks, trade names, patents, patent applications and copyrights owned or held by Seller and related to the Assets, none of which motor vehicle titles and current registrations, fuel permits, franchises, certificates, trademarks, tradenames, patents, patent applications and copyrights infringe on the rights of others and all of which are now valid, in good standing and in full force and effect. Except as set forth on Schedule 6.7, such motor vehicle titles and current registrations, fuel permits, franchises, certificates, trademarks, trade names, patents, patent applications and copyrights are adequate for the operation of the Landfill as presently constituted.

Section 6.8. Personal Property. (i) Listed on Schedule 1.1(c) hereto is a complete and accurate list of all Equipment. Each piece of Equipment is in good working order and has been maintained in a good and proper manner, ordinary wear and tear excepted.

(ii) Listed on Schedule 1.1(d) hereto is a complete and accurate list of all Rolling Stock. Each motor vehicle, attachment, accessory and piece of materials handling equipment comprising the Rolling Stock is in good working order and has been maintained in a good and proper manner, ordinary wear and tear excepted.

(iii) all of the Assets are either owned by Seller or leased under an agreement indicated on Schedule 6.8(iii). All leases set forth on Schedule 6.8(iii) are in full force and effect and constitute valid and binding agreements of the parties (and their successors) thereto in accordance with their respective terms. No default by Seller or any other party to any of such leases exists or would exist except for the passage of time or delivery of a notice or both.

(iv) At the Closing, Seller shall have good and marketable title to the Assets, free and clear of all debts, lease payments, liens, encumbrances, security interests, equities or restrictions whatsoever and, by virtue of the grant, conveyance, sale, transfer, and assignment of the Assets hereunder, Buyer shall receive good and marketable

title to the Assets, free and clear of all debts, lease payments, liens, encumbrances, security interests, equities or restrictions whatsoever. The Assets constitute all of the operating assets owned by Seller and used in the Landfill.

Section 6.9. Title to Real Property. Seller has good title to the Land except as permitted under Article 3 hereof. Except as may be disclosed by the Historical Information, to the best of Seller's knowledge:

(a) Since February 14, 1986, the Land has been licensed, permitted and authorized for the operation of the Landfill under all Environmental Laws (hereinafter defined) relating to the protection of the environment, the Land and the conduct of the Landfill thereon (including, without limitation, all zoning restrictions and land use requirements).

(b) The Land is usable for its current uses, and the Land (subject to the satisfaction of the Governmental Transfer Requirements and Buyer's post-closing compliance with the Permits and Regulations) can be used by Buyer after the Closing as a solid waste landfill in the manner currently operated by Seller, without violating any Environmental Law or private restriction, and such uses are legal conforming uses.

(c) Except pursuant to the Methane Contract, no third parties have any rights to drill or explore for, collect, produce, mine, excavate, deliver or transport oil, gas, coal, or other minerals in, on, beneath, across, over, through, from or to any portion of the Land.

(d) Neither the Land nor Seller now is or ever has been involved in any litigation or administrative proceeding seeking to impose fines, penalties or other liabilities or seeking injunctive relief for violation of any Environmental Laws relating to the environment.

(e) Except for Northern Bituminous, no party has a present or future right to possession of all or any part of the Land.

(f) There are no mechanics' liens affecting the Land and no work has been performed on the Land within 120 days of the date hereof for which a mechanics' lien could be filed which has not been paid for.

(g) Except for the special assessments assumed by Buyer under Section 11.2(ii) below, there are no levied or pending special assessments affecting all or any part of the Land owed to any governmental entity which will not be paid at Closing and none is threatened.

(h) There are no proceedings or amendments pending and brought by or, threatened by, any third party which would result in a change in the allowable uses of the Land or which would modify the right of Buyer to use the Land for a solid waste landfill after the Closing Date.

(i) There are no pending or threatened condemnation or eminent domain proceedings affecting all or any part of the Land.

Section 6.10. Contracts. Schedule 1.1(h) shall be a complete and accurate list of the Customer Contracts and Related Approvals as of its date and true and complete copies of the Customer Contracts and Related Approvals delivered to Buyer. None of the Customer Contracts or Related Approvals listed on Schedule 1.1(h) have been modified, altered, terminated or otherwise amended and there have been no waivers, oral agreements, representations or other statements with relation thereto. Except as set forth on Schedule 1.3, all Customer Contracts are (and will be immediately following the Closing) in full force and effect and are valid, binding and enforceable against the respective parties thereto in accordance with their respective provisions and Seller is not in default in, nor has there occurred an event or condition (including Seller's execution and delivery of or performance under this Agreement) which with the passage of time or the giving of notice (or both) would constitute a default, with regard to the payment or performance of any obligation under any Customer Contract; no claim of such a default has been asserted and there is no reasonable basis upon which such a claim could validly be made. Seller has

not received any notice that any person intends or desires to modify, waive, amend, rescind, release, cancel or terminate any Customer Contract; provided, however, that Buyer acknowledges that the residential accounts are oral and the individual residents are entitled to terminate service at any time. By virtue of the grant, conveyance, sale, transfer and assignment of the Customer Contracts by Seller to Buyer hereunder, Buyer shall own and hold all right, title and interest of Seller in and to the Customer Contracts, without the consent or approval of any other person or entity.

Section 6.11. Insurance Policies. During the Review Period, Seller shall deliver to Buyer complete and accurate copies as of the date hereof of all insurance policies carried by Seller relative to the Assets or the operation of the Landfill and an accurate list of all insurance loss runs and workers' compensation claims received for the past three policy years, which shall at Closing be attached hereto as Schedule 6.11. All such insurance policies are in full force and effect and shall remain in full force and effect through the Closing Date. Seller's insurance relative to the Assets or the operation of the Landfill has never been cancelled and Seller has not been denied coverage within the last three years.

Section 6.12. Employees; Compensation. Attached as Schedule 6.12 is a complete and accurate list of all employees of Seller currently employed in connection with the Assets or the operation of the Landfill (the "Employees") and their rate of compensation as of the date hereof (including a breakdown of the portion thereof attributable to salary, bonus and other compensation, respectively). Each Employee is an employee at will. Buyer shall not be obligated to hire any Employees of Seller.

Section 6.13. Employee Relations and Benefit Plans. During the Review Period, Seller shall deliver to Buyer an accurate and complete list of all agreements of any kind between Seller and the Employees or group of Employees, including, without limitation, employment agreements, collective bargaining agreements and benefit plans, which shall at Closing be attached hereto as Schedule 6.13. Buyer shall not, by the execution and delivery of this Agreement or

otherwise, become obligated to employ any Employee of Seller or assume any liabilities or contractual obligations with respect to such Employees or otherwise become liable for or obligated in any manner (contractual or otherwise) to any employee of Seller, including, without limiting the generality of the foregoing, any liability or obligation pursuant to any collective bargaining agreement, employment agreement, or pension, profit sharing or other employee benefit plan (within the meaning of Section 3(3) of the Employment Retirement Income Security Act of 1974, as amended) or any other fringe benefit program maintained by Seller or to which Seller contributes or any liability for the withdrawal or partial withdrawal from or termination of any such plan or program by Seller.

Section 6.14. Gross Revenues. The gross revenues generated by the Landfill for the 12-month period immediately preceding the month in which this Agreement is executed were $8,538,217.

Section 6.15. Compliance with Law; No Conflicts.

(i) To the best of Seller's knowledge and except as may be otherwise disclosed by the Historical Information, Seller has in the past (within the times allowed by the Permits, Regulations or governmental agencies exercising jurisdiction) complied with, and is now in compliance with, all Environmental Laws. Except for routine inspections and follow through by governmental agencies exercising jurisdiction, Seller has not received any notice that Seller is under investigation or other form of review with respect to any Environmental Law; and

(ii) the execution, delivery and performance of this Agreement, the consummation of any transactions herein referred to or contemplated hereby and the fulfillment of the terms hereof and thereof will not:

(a) conflict with, or result in a breach or violation of the Articles of Incorporation or Bylaws of Seller;

(b) except as set forth on Schedule 6.15, conflict with, or result in a breach under any document, agreement or other instrument to which Seller is a party, or result in the creation or imposition of any lien, charge or encumbrance on any properties of Seller pursuant to: (A) any law or regulation to which Seller, or any of its properties are subject, or (B) any judgment, order or decree to which Seller is bound or any of its property is subject;

(c) result in termination or any impairment of any permit, license, franchise, contractual right or other authorization of Seller; or

(d) except for the filings by Seller required by the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), require notice to, or the consent or approval of, any governmental authority or agency or other third party in order to remain in full force and effect.

Section 6.16. Taxes. Seller has recently settled a long standing and ongoing dispute with Dakota County over Seller's claim of unconstitutionality of certain landfill surcharge fees which were imposed on Seller by the County and the County's claim of deficiency amounts relative to other landfill surcharges; Seller is now proceeding to negotiate settlement with the City of Burnsville and the State of Minnesota of claims which they have which shadow the claims which are now settled with the County. The foregoing disputes are referred to herein as the "Surcharge Disputes". Seller has filed, or will file, in a timely manner all requisite federal, state, local and other tax returns due for all fiscal periods ended on or before the date hereof and as of the Closing shall have filed in a timely manner all such returns due for all periods ended on or before the Closing Date. No federal, state, local or other tax returns or tax reports filed by Seller (whether filed prior to, on or after the date hereof) with respect to the Landfill or the Assets will result in any taxes, assessments, fees or other governmental charges upon the Assets or Buyer, whether as

a transferee of the Assets or otherwise. Except for the amounts involved in the Surcharge Disputes, all federal, state and local taxes due and payable with respect to the Landfill or the Assets have been paid, including, without limiting the generality of the foregoing, all federal, state and local income, sales, use franchise, excise and property taxes. There are no agreements to extend the statutory period for the assessment of any taxes, examinations in progress or claims against Seller for federal, state, local and other taxes (including penalties and interest) for any period or periods prior to and including the date hereof (and as of the Closing Date) and, except for the amounts involved in the Surcharge Disputes, no notice of any claim, whether pending or threatened, for taxes has been received. The amounts shown as accruals for taxes on the Financial Statements are sufficient in accordance with GAAP for the payment of all taxes of the kinds indicated (including penalties and interest) for all fiscal periods ended on or before the Closing Date except as may be involved in the Surcharge Disputes.

<u>Section 6.17</u>. <u>Litigation</u>. Except for the Surcharge Disputes or as set forth on Schedule 6.17, there is no litigation, action, suit or proceeding, formal arbitration, informal arbitration or mediation, administrative, judicial or otherwise, pending or, to the best of Seller's knowledge, threatened, against Seller relating to or affecting the Assets or Landfill, at law or in equity, before any federal, state or local court or regulatory agency, or other governmental or private authority; and no notice of any of the above has been received by Seller.

<u>Section 6.18</u>. <u>Absence of Price Renegotiation Contracts</u>. Seller is not now a party to any governmental contracts related to the operation of the Landfill which are subject to price redetermination or renegotiation.

<u>Section 6.19</u>. <u>Conduct of Seller's Business Since Balance Sheet Date</u>. Since the Balance Sheet Date, there has not been any:

(i) change in the authorized capital or equity ownership of Seller;

(ii) work interruption, labor grievance or claim filed involving the Landfill;

(iii) sale or transfer of, or any agreement to sell or transfer, any of the Assets or any plan, agreement or arrangement granting any preferential right to purchase or acquire any interest in any of the Assets, or requiring consent of any party to the transfer and assignment of any of the Assets;

(iv) breach, amendment or termination of any Customer Contract other than in the ordinary course of business;

(v) amendment to the Articles of Incorporation or Bylaws of Seller; or

(vi) any action by Seller, or any employee, officer or agent of Seller, committing to do any of the foregoing.

Section 6.20. Hazardous Materials. (a) Except as may be disclosed by the Historical Information, to the best of Seller's knowledge, Seller has never owned, leased, had an interest in, generated, transported, stored, handled, recycled, reclaimed, disposed of, or contracted for the disposal of, hazardous materials, hazardous wastes, hazardous substances, toxic wastes or substances, infectious or medical waste, radioactive waste or sewage sludges as those terms are defined by the Resource Conservation and Recovery Act of 1976; the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"); the Atomic Energy Act of 1954; the Toxic Substances Control Act; the Occupational Health and Safety Act; any comparable or similar Minnesota statute; any other Environmental Law or the rules and regulations promulgated under any of the foregoing, as each of the foregoing may have been from time to time amended (collectively, "Hazardous Materials"), except in accordance with all Environmental Laws. Except as may be disclosed by the Historical Information, to the best of Seller's knowledge, there have been no spills, leaks, deposits or other releases into the environment or onto or under the Land of any Hazardous Materials except for accidental spills which were

remediated in accordance with Environmental Laws. No liens with respect to environmental liability have been imposed against Seller relating to the Landfill or any of the Assets under CERCLA, any comparable Minnesota statute or other Environmental Law.

(b) To the best of Seller's knowledge, there are no outstanding orders or notices of any governmental agency relating to any asserted violation of any Environmental Law relative to the Land which is not disclosed to Buyer; and

(c) To the best of Seller's knowledge, no state of facts which relates to an adverse Environmental Condition exists on the date of Closing in respect to the Land or the operation of the Landfill and which is not disclosed to Buyer in the Historical Information or in Seller's Supplemental Information and Commentary.

Section 6.21. Underground Storage Tanks. Except as may be disclosed by the Historical Information, to the best of Seller's knowledge, Seller has never owned, leased or operated any real property having any underground or above-ground storage tanks containing Hazardous Materials, petroleum products or wastes or other hazardous substances regulated by 40 CFR 280 or other Environmental Law except for the leachate holding tanks which are a part of the Landfill operation and except for condensate holding tanks which are a part of the methane recovery operation, each of which have been maintained in accordance with Environmental Laws.

Section 6.22. Corrupt Practices. To the best of Seller's knowledge, Seller has never made, offered or agreed to offer anything of value to any employees of any customers of Seller for the purpose of attracting business to Seller or to any foreign or domestic governmental official, political party or candidate for government office or any of their employees or representatives, nor have they otherwise taken any action which would cause it to be in violation of the Foreign Corrupt Practices Act of 1977, as amended.