**ARTICLE 7. REPRESENTATIONS AND WARRANTIES OF BUYER AND USA WASTE.**

Buyer and USA Waste represent and warrant that the statements contained in this Article 7: (i) are correct and complete as of the date of this Agreement; (ii) will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the date of this Agreement throughout this Article 7); and (iii) shall survive the Closing, in accordance with Section 12.1. The warranties by Buyer and USA Waste set forth in this Article shall inure solely to Seller and not to any successor or assigns of Seller and shall not extend to any matter which is within the knowledge of Seller at the end of the Review Period.

Section 7.1. Corporate Organization. Buyer is duly incorporated, validly existing and in good standing under the laws of the State of Minnesota. Buyer is duly authorized, qualified and licensed under all applicable laws, regulations and ordinances of public authorities to carry on its businesses in the places and in the manner as now conducted except for where the failure to be so authorized, qualified or licensed would not have a material adverse affect on such businesses.

Section 7.2. USA Waste Stock. The USA Waste Stock to be delivered to Seller in connection with this Agreement, when delivered in accordance with the terms of this Agreement, will constitute valid and legally issued shares, fully paid and nonassessable.

Section 7.3. Corporate Authority. The officers of Buyer and USA Waste executing this Agreement have the corporate authority to enter into and bind Buyer and USA Waste to the terms of this Agreement and Buyer and USA Waste have each taken all necessary corporate action to authorize the execution, delivery and performance of this Agreement. All corporate action by Buyer necessary to approve the transaction, including both shareholder and director approvals (if required), has been taken.



EXHIBIT 1
Affidavit of
Erin K. Fogarty Lisle
(continued)

Section 7.4. No Conflicts. The execution, delivery and performance of this Agreement, the consummation of any transactions herein referred to or contemplated hereby and the fulfillment of the terms hereof and thereof will not:

(i) conflict with, or result in a breach or violation of the Articles of Incorporation or Bylaws of Buyer;

(ii) conflict with, or result in a material breach under any document, agreement or other instrument to which Buyer is a party, or result in the creation or imposition of any lien, charge or encumbrance on any properties of Buyer pursuant to: (A) any law or regulation to which Buyer or any of its property is subject, or (B) any judgment, order or decree to which Buyer is bound or any of its property is subject;

(iii) result in termination or any impairment of any material permit, license, franchise, contractual right or other authorization of Buyer; or

(iv) except for the filings by Buyer required by the HSR Act, require the consent of, or the filing with any governmental authority or agency or any other third party in order to remain in full force and effect.

Section 7.5. Public Announcement. After execution of this Agreement, but prior to any filing under the HSR Act, USA Waste shall make a public announcement concerning this transaction, in form and substance reasonably satisfactory to Seller.

Section 7.6. Binding Agreement. This Agreement is the binding and valid obligation of Buyer and USA Waste, enforceable against each of them in accordance with its terms.

ARTICLES 8. COVENANTS OF SELLER PRIOR TO CLOSING

Section 8.1. Access to Land and Records. Between the date of this Agreement and the Closing Date, Seller will afford to or obtain for the officers and authorized representatives of Buyer access to all of the Land (including, without limitation, for the purpose of performing all testing, inspections and other procedures considered desirable by Buyer), sites, books and records of Seller, including, without limitation, the Historical Information and

Permits at all reasonable times and upon reasonable notice and will furnish Buyer with such additional financial and operating data and other information as to the business and properties, both current and former, of Seller as Buyer may from time to time reasonably request. Seller will cooperate with Buyer, its representatives, engineers, auditors and counsel in the preparation of any documents or other material which may be required in connection with any documents or materials required by any governmental agency. Buyer will cause all information obtained in connection with the negotiation of this Agreement to be treated as confidential in accordance with the provisions of Article 14 hereof.

Section 8.2. Activities of Seller Prior to Closing. Between the date of this Agreement and the Closing Date, Seller will:

(a) maintain the Assets in as good working order and condition as at present, ordinary wear and tear excepted;

(b) perform all of its obligations under the Permits, Customer Contracts and Related Approvals;

(c) keep in full force and effect present insurance policies or other comparable insurance coverage with reputable insurers;

(d) use reasonable efforts to maintain its relationships with suppliers, customers, consultants, independent contractors and others having business relations with Seller relative to the operation of the Landfill;

(e) maintain compliance with all Environmental Laws;

(f) maintain and perform present debt and lease instruments in accordance with their terms and not enter into new or amended debt or lease instruments relative to the Assets or the operation of the Landfill, without the prior written consent of Buyer;

(g) provide the interim financial statements required by Section 6.5; and

(h) provide all reasonable assistance to Buyer to provide for an orderly transfer of the Assets from Seller to Buyer.

(i) See page 59. JKH DLK

Section 8.3. Prohibited Activities Prior to Closing. Between the date of this Agreement and the Closing Date, Seller will not, without the prior written consent of Buyer:

(a) change the authorized capital, admit new shareholders or permit the withdrawal of existing shareholders of Seller, or grant any options, warrants, puts, calls, conversion rights or commitments relating to its equity interests of any kind;

(b) enter into any new contract or commitment related to the Assets or the operation of the Landfill that would bind Buyer after Closing;

(c) incur or agree to incur any debt for money borrowed related to the Assets or the operation of the Landfill or make any capital expenditures related to the Assets or the operation of the Landfill in excess of an aggregate of $5,000;

(d) create, assume or permit to exist any mortgage, pledge or other lien or encumbrance upon any Assets;

(e) breach or permit a breach of, amend or terminate, any Customer Contract or Related Approvals;

(f) make any oral or written announcement concerning this transaction except as may be required by law, all of which announcements, if any, shall be forwarded to Buyer for review and comment at least seven days prior to dissemination;

(g) enter into any other transaction related to the Assets or the operation of the Landfill that is outside the ordinary course of the business of Seller or otherwise prohibited hereunder; or

(h) allow any other action or omission, or series of actions or omissions, that would cause a representation and warranty of Seller made in Section 6.19 of this Agreement to be untrue on the Closing Date.

Section 8.4. Haul Tech. Between the date of this Agreement and the Closing Date, Buyer and Seller shall negotiate in good faith for the acquisition of the Haul Tech Business by Buyer. If the parties reach an agreement on such acquisition, it shall be closed contemporaneously with the Closing hereunder; provided,

however, that failure of the parties to reach an agreement to acquire the Haul Tech Business shall not be a condition to the Closing and shall not give either party a right to refuse to Close.

ARTICLE 9. CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER

The obligations of Seller hereunder are subject to the completion, satisfaction, or at its option, waiver, on or prior to the Closing Date, of the following conditions.

Section 9.1. Representations and Warranties. The representations and warranties of Buyer and USA Waste contained in this Agreement shall be accurate on and as of the Closing Date with the same effect as though such representations and warranties had been made on and as of such date; and each and all of the terms, covenants and conditions of this Agreement to be complied with and performed by Buyer and USA Waste on or before the Closing Date shall have been duly complied with and performed.

Section 9.2. Consents. All necessary notices to, consents of and filings with any governmental authority or agency or other third party relating to the consummation of the Closing or the other transactions contemplated herein to be made or obtained by Buyer shall have been obtained and made, including, without limitation, all consents required under the HSR Act (or the expiration of the required waiting period) and all consents to assignment required by Customer Contracts as set forth in Section 1.3.

Section 9.3. USA Waste Stock. The value of the USA Waste Stock determined based on the closing price of said stock on the last public trading day prior to the Closing Date shall not be less than the Agreed Value of the USA Waste Stock determined according to Section 2.3, above. If this condition is not met, Buyer may, at its option, satisfy this condition by paying the shortfall to Seller on the Closing Date.

Section 9.4. No Adverse Proceeding. No action or proceeding before a court or any other governmental agency or body shall have been instituted or, to the best of Buyer's knowledge,

threatened to restrain or prohibit any of the transactions contemplated by this Agreement.

Section 9.5. Noncompetition Agreements. Buyer shall have executed and delivered at the Closing the Noncompetition Agreements in the form and substance satisfactory to Buyer and Seller.

Section 9.6. Opinion of Counsel. Seller shall have received an opinion of counsel from Bryan Blankfield, Assistant General Counsel to USA Waste, dated the Closing Date, in form and substance reasonably satisfactory to Seller. The said opinion of counsel shall include a statement to the effect that it is the opinion of counsel that none of the shares of USA Waste Stock will be subject to any restrictions on transfer, except restrictions imposed by the Securities Act of 1933, as amended (the "Act"), or the rules and regulations promulgated thereunder, and the said restrictions imposed by the Act or the rules and regulations promulgated thereunder shall not limit Seller's ability to resell any or all of such shares of USA Waste Stock on the Closing Date or at any time thereafter as warranted by USA Waste in Article 15, below.

Section 9.7. Methane Gas Property Leasehold. Buyer and Seller have reached all necessary agreements for which the documentation has been prepared and approved by the parties relative to the Methane Gas Property Leasehold.

Section 9.8. Covenants. Each and all of the terms, covenants and conditions of this Agreement to be complied with and performed by Buyer on or before the Closing Date shall have been duly complied with and performed.

Section 9.9. Cover Material. Seller and Buyer shall have entered into an agreement concerning the delivery of cover material to the Landfill in form and substance acceptable to Buyer and Seller.

Section 9.10. Environmental Condition; Title to Land. Seller shall be satisfied prior to the date of Closing that it can give without qualification the representations and warranties required of Seller under this Agreement. In the event Seller, in

its sole discretion, shall determine prior to the Closing Date that it is unable to give such representations and warranties, then Seller shall provide written notice to Buyer no later than 5:00 p.m. Minnesota time on the last calendar day prior to the date of Closing identifying which representations and warranties it is unable to give and any necessary modifications thereto. Buyer shall then have the option to consummate the transaction with the modified representations and warranties. If Buyer decides not to consummate the Closing with the modified representations and warranties, then neither party shall have any further obligation to the other hereunder.

## ARTICLE 10. CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER

The obligations of Buyer hereunder are subject to the completion, satisfaction or, at its option, waiver, on or prior to the Closing Date, of the following conditions.

Section 10.1. Representations and Warranties. The representations and warranties of Seller contained in this Agreement shall be accurate on and as of the Closing Date with the same effect as though such representations and warranties had been made on and as of such date, and a certificate to the foregoing effect, or setting forth any discrepancies in such representations and warranties which have arisen since the date of this Agreement, dated the Closing Date and signed by Seller shall have been delivered to Buyer. The foregoing notwithstanding, Seller agrees that no limitation of any representation or warranty shall restrict Buyer's right to terminate this Agreement if any such representation or warranty as set forth in Article 6 is inaccurate as of the Closing Date.

Section 10.2. Covenants. Each and all of the terms, covenants and conditions of this Agreement to be complied with and performed by Seller on or before the Closing Date shall have been duly complied with and performed.

Section 10.3. No Adverse Proceeding. No action or proceeding before a court or any other governmental agency or body shall have been instituted or threatened to restrain or prohibit

any of the transactions contemplated by this Agreement, and no governmental agency or body shall have taken any other action or made any request of Buyer as a result of which the management of Buyer deems it inadvisable to proceed with the transactions hereunder.

Section 10.4. No Adverse Change. No material and adverse change in the results of operations, financial condition or business of Seller related to the Assets or operation of the Landfill shall have occurred since the Balance Sheet Date. Seller shall not have suffered any loss or damage to any Assets, whether or not covered by insurance, since the Balance Sheet Date, which change, loss or damage would materially affect or impair the ability of Buyer to operate the Landfill.

Section 10.5. General Release. Seller and David R. Kraemer shall have delivered to Buyer an instrument dated the Closing Date releasing Buyer and USA Waste from any and all claims of Seller and David R. Kraemer against Buyer or USA Waste arising out of events which occurred prior to the Closing (but not including any claims pursuant to this Agreement).

Section 10.6. Consents. All necessary notices to, consents of and filings with any governmental authority or agency or other third party relating to the consummation of the transactions contemplated herein to be made or obtained by Seller shall have been obtained and made or obtained by Company shall have been obtained and made, including, without limitation, all consents required under the HSR Act (or the expiration of the required waiting period).

Section 10.7. Good Standing Certificates. Seller shall have delivered to Buyer a certificate, dated as of a date no earlier than 10 days prior to the Closing Date, duly issued by the appropriate governmental authority or authorities showing that Seller is in good standing in Wisconsin and is authorized to do business in Minnesota.

Section 10.8. Opinion of Counsel. Buyer shall have received an opinion from Stroud, Stroud, Willink, Thompson and Howard, counsel to Seller, dated the Closing Date, in form and substance reasonably satisfactory to Buyer.

Section 10.9. Noncompetition Agreements. The Noncompetition Agreements shall have been executed and delivered by all parties thereto at the Closing, in form and substance satisfactory to Buyer and Seller.

Section 10.10. Updated Agreements. Seller shall have delivered to Buyer (a) Schedule 1.1(h), and (b) any supplements thereto (dated the Closing Date, listing all agreements entered into by Seller relative to the Landfill or the other Assets since the date of Schedule 1.1(h)), which schedule (as supplemented) must be determined by Buyer to be acceptable, in its sole discretion.

Section 10.11. Transferability of Permits. Buyer shall have determined, in its sole discretion, that as a result of this transaction all of the Permits required for the operation of the Landfill have been transferred to Buyer, or can be so transferred without further public hearing or other regulatory re-approval process.

Section 10.12. Environmental Review. The obligations of Buyer under this Agreement are contingent upon Buyer being satisfied prior to the Closing Date that (i) the Environmental Condition of the Land is suitable for its purchase and ownership; and (ii) the operation of the Landfill in the past by Seller and the continuance of such operation in the future by Buyer is acceptable to Buyer taking into account the Environmental Conditions, the Permits and Regulations. In the event that Buyer, in its sole discretion shall determine that the Land is not suitable for its purchase and ownership or that the operation of the Landfill by Seller in the past is not acceptable, or the continuance of the operation of the Landfill and Buyer's ownership is not acceptable, then Buyer shall notify Seller in writing no later than 5:00 p.m. Minnesota time on the last calendar day prior to the date of Closing. In the event Buyer delivers such notice to Seller, and unless Buyer and Seller otherwise mutually agree, this

Agreement shall be terminated and no party shall have any further liability to the other under this Agreement.

Section 10.13. Survey. Seller shall have delivered the Survey to Buyer in form and substance provided for in Article 3 and otherwise acceptable to Buyer.

Section 10.14. Expansion Permits. Seller shall have obtained all of the permits, consents and other approvals (the "Expansion Permits") required to construct and operate a landfill for disposal of construction/demolition material on the Land with at least 1,700,000 cubic yards of available airspace and without conditions or provisions that are unacceptable to Buyer; and each Expansion Permit shall have become final and either (A) the appeals period has expired without an appeal having been taken or (B) any appeal filed has been finalized in a manner that does not deny the applicable Expansion Permit or impose conditions or provisions thereon which are unacceptable to Buyer.

Section 10.15. Cover Material. Seller and Buyer shall have entered into an agreement concerning the delivery of cover material to the Landfill in form and substance acceptable to Buyer and Seller.

Section 10.16. Electric Transmission Lines. Seller shall have provided to Buyer information satisfactory to Buyer concerning the feasibility and cost of relocating to a location off the Land or within a buffer zone of the Landfill on the Land if such location does not interfere with Buyer's operational, closing, post-closing or monitoring obligations, the high tension electric transmission lines and towers currently existing on the Land.

Section 10.17. Private Roadway Access. Seller shall have provided to Buyer evidence satisfactory to Buyer of Buyer's right and ability to utilize the private access roadways currently used by Seller for access to the Landfill, at a cost acceptable to Buyer in accordance with Exhibit A.

Section 10.18. Methane Gas Property Leasehold. Buyer and Seller have reached all necessary agreements for which the documentation has been prepared and approved by the parties relative to the Methane Gas Property Leasehold.

Section 10.19. Title Policy. Buyer is satisfied in all respects with the status of title to the Land as shown by the Owners Policy Commitment after modification by the Title Company at the Closing for matters covered by Seller's affidavit to liens and possession and the Survey.

Section 10.20. General. All actions taken by Seller in connection with the consummation of the transactions contemplated hereby and all certificates, opinions and other documents required to effect the transactions contemplated hereby will be reasonably satisfactory in form and substance to Buyer.

## ARTICLE 11. NON-ASSUMPTION OF LIABILITIES

Section 11.1. Non-Assumption of Liabilities. Except as explicitly set forth in Section 11.2 below, Buyer shall not, by the execution and performance of this Agreement or otherwise, assume, become responsible for or incur any liability or obligation of any nature of Seller or David R. Kraemer whether legal or equitable, matured or contingent, known or unknown, foreseen or unforeseen, ordinary or extraordinary, patent or latent, whether arising out of occurrences prior to, at or after the date of this Agreement, including, without limiting the generality of the foregoing, any liability or obligation arising out of or relating to: (a) any occurrence or circumstance (whether known or unknown) which occurs or exists on or prior to the date of this Agreement and which constitutes, or which by the lapse of time or giving notice (or both) would constitute, a breach or default under any lease, contract, or other instrument or agreement (whether written or oral) other than the Customer Contracts; (b) injury to or death of any person or damage to or destruction of any property, whether based on negligence, breach of warranty, or any other theory; (c) violation of the requirements of any governmental authority or of the rights of any third person, including, without limitation, any requirements relating to the reporting and payment of federal, state, local or other income, sales, use, franchise, excise or property tax liabilities of Seller; (d) the generation, collection, transportation, storage or disposal by Seller of Hazardous

Materials; (e) any agreement or arrangement between Seller and the employees of Seller or any labor or collective bargaining unit representing any such employees; (f) any severance pay obligation of Seller or any employee benefit plan (within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended) or any other fringe benefit program maintained or sponsored by Seller or to which Seller contributes or any contributions, benefits or liabilities therefor or any liability for the withdrawal or partial withdrawal from or termination of any such plan or program by Seller; (g) any obligations related to any of the Excluded Assets or the Excluded Businesses; (h) the debts of Seller; and (i) liabilities or obligations of Seller for brokerage or other commissions relative to this Agreement or the transactions contemplated hereunder. Seller hereby agrees to indemnify Buyer, its successors and assigns from and against all of the above liabilities and obligations in accordance with Article 12 below.

Section 11.2. Assumption of Specific Obligations. (i) Buyer agrees to assume and perform to the extent, and only to the extent, such obligations first mature and are required to be performed subsequent to the close of business on the date of Closing:

(a) all of Seller's obligations under the Customer Contracts;

(b) all of Seller's obligations under the Northwest Lease and Methane Contract, provided that any liability associated with the Methane Contract accrued prior to the Closing Date shall be the responsibility of Seller;

(c) all of Seller's mitigation obligations under the U.S. Army Corps of Engineers Section 404 Wetlands Permit;

(d) all of Seller's remaining obligations to the City of Burnsville ("City"):

(1) under §§ 7 ("Wetland Mitigation and Wetland Nature Center") and 11 ("Drainage") of that certain agreement entitled Planned Unit Development for Landfill, Quarry and Wetland/Nature Center ("PUD Agreement"), a copy of which is attached as Schedule 11.2(d)-x, including the assessment and

other obligations set forth in the sequel agreement entitled Public Improvement and Special Assessment Agreement, dated November 20, 1995, a copy of which is attached as Schedule 11.2(d)-y, which assessments are in the finalized amounts and are due and payable as described in Schedule 11.2(d)-z; and

(2) under §§ 2, 3, 4, 5, 6, 9, 10, 12, 13, 14 of the PUD Agreement but only insofar as said sections pertain to the Land.

(e) all of Seller's obligations under the MPCA Trust; and

(f) all of Seller's liabilities, loss or expense which Buyer or its successors and affiliates may incur relative to Seller's operation of the Landfill, any Environmental Conditions, or related to the Permits or Regulations, regardless of when the events giving rise to such liabilities, loss or expense may have occurred (provided, however, that Buyer's assumption of liability hereunder shall not extend to any liability, loss or expense which is a breach by Seller of any representation or warranty contained in this Agreement).

(ii) Buyer assumes the payment of the assessments described in Schedule 11.2(d)-z even though some of the amounts have been assessed against parcels ("Seller Retain Parcels") which are owned by Seller but which are not included in the Land which Buyer is purchasing. Buyer agrees to indemnify and hold Seller harmless in respect to the assessments which are assumed by Buyer on Seller Retained Parcels in accordance with Article 12 hereof. Seller agrees that the assessments assumed by Buyer which are outstanding against Seller Retained Parcels may remain outstanding so long as Buyer is timely in its assessment payments. If Seller wishes to remove the assessments from one or more of the Seller Retained Parcels, Seller may do so by prepaying to the City the assessment(s) involved; following any such prepayment

by Seller, Buyer shall pay to Seller the assessment and interest payments which Buyer would have paid to the City if the prepayment had not been made by Seller.

(iii) Buyer agrees to assume and perform all of Seller's obligations as principal to sureties in respect to bonds furnished by Seller pursuant to the Permits or Regulations in regard to operation of the Landfill, which bonds Buyer agrees to promptly replace after Closing thus securing termination of such obligations on the part of Seller.

## ARTICLE 12. INDEMNIFICATION

Section 12.1. Survival of Representations, Warranties and Covenants. All of the representations, warranties and covenants of any party hereto contained in this Agreement and the liabilities and obligations of the parties with respect thereto shall survive the Closing hereunder for three years after the Closing Date; provided, however, that the covenants, agreements, representations and warranties in Sections 2.2, 6.1, 6.2, 7.1, 7.2, 7.3, 11.1, 11.2, 16.3, 16.7 and 16.18 shall survive until the expiration of the applicable statute of limitations period.

Section 12.2. Indemnification by Seller. Seller agrees that it will indemnify, defend (as to third party claims only), protect and hold harmless Buyer, its officers, shareholders, directors, divisions, subdivisions, affiliates, subsidiaries, parent, agents, employees, successors and assigns at all times from and after the date of this Agreement from and against all liabilities, claims, damages, actions, suits, proceedings, demands, assessments, adjustments, penalties, losses, costs and expenses whatsoever (including specifically, but without limitation, court costs, reasonable attorneys' fees and expenses and expenses of investigation) whether equitable or legal, matured or contingent, known or unknown, foreseen or unforeseen, ordinary or extraordinary, patent or latent, whether arising out of occurrences prior to, at or after the date of this Agreement, incurred as a result of or incident to: (a) any breach of, misrepresentation in, untruth in or inaccuracy in the representations and warranties by

Seller (including, without limitation, those relating to Seller's environmental compliance), set forth herein or in the Schedules, Exhibits or certificates attached hereto or delivered pursuant hereto; (b) nonfulfillment or nonperformance of any agreement, covenant or condition on the part of Seller made in this Agreement; (c) the matters set forth in Section 11.1 which are not set forth in Section 11.2; (d) the imposition upon Buyer of any liability or obligation of Seller resulting from one or more pending or threatened lawsuits, legal or regulatory proceedings, investigations or judgments which are not disclosed by the Historical Information or otherwise disclosed to Buyer in writing prior to Closing; or (e) any claim by a third party that, if true, would mean that a condition for indemnification set forth in subsections (a) through (d) of this Section 12.2 had been satisfied.

<u>Section 12.3</u>. <u>Indemnification by Buyer and USA Waste</u>. Buyer and USA Waste agree that they will indemnify, defend (as to third party claims only), protect and hold harmless Seller at all times from and after the Closing Date from and against all liabilities, claims, damages, actions, suits, proceedings, demands, assessments, adjustments, penalties, losses, costs and expenses whatsoever (including specifically, but without limitation, court costs, reasonable attorneys' fees and expenses and expenses of investigation) whether equitable or legal, matured or contingent, known or unknown, foreseen or unforeseen, ordinary or extra-ordinary, patent or latent, incurred by Seller as a result of or incident to: (i) any breach of, misrepresentation in, untruth in or inaccuracy in the representations and warranties set forth herein, or in the Schedules or certificates attached hereto or delivered pursuant hereto by Buyer or USA Waste; (ii) nonfulfillment or nonperformance of any agreement, covenant or condition on the part of Buyer or USA Waste made in this Agreement; (iii) all matters set forth in Section 11.2 hereof; and (iv) any claim by a third party that, if true, would mean that a condition for indemnification set forth in subsections (i)-(iii) of this Section 12.3 had been satisfied.

<u>Section 12.4</u>. <u>Limitation on Seller's Liability for Certain Obligations</u>. Notwithstanding anything to the contrary which is contained in this Agreement, Seller shall have liability to Buyer and USA Waste in respect to the representations and warranties set forth in this Agreement regarding Hazardous Materials, Environmental Conditions, Environmental Laws, the Permits or Regulations only if Seller has failed to disclose to Buyer matters (i) which are relevant to the warranty or representation, (ii) which are within the best knowledge of Seller (as defined Article 6, above), (iii) which are not within the knowledge of Buyer prior to the end of the Review Period, and (iv) which are not disclosed (as defined in Article 6) by the Historical Information (as defined in Section 5.1, above).

The indemnification obligation of Seller set forth in this Article 12 in respect to Seller's warranties and obligations pertaining to Hazardous Materials, Environmental Conditions, Environmental Laws, the Permits or Regulations shall apply only to claims (a)(i) in respect to which Buyer has given written notice to Seller (which specifically describes the same) prior to expiration of the three year period described in Section 12.1, above, and (ii) which involve governmental clean up programs, if any, and third-party liability, and (b) then only after (i) for each such claim, to the extent it exceeds funds available and collectible for corrective action or indemnity under such governmental programs, and (ii) the aggregate amount of such claims owing after applying (b)(i) above, exceeds $250,000, at which time the indemnification obligations shall be effective only as to amounts above $250,000. Further, the said indemnification obligations of Seller set forth in this Article 12 in respect to claims for breach of a warranty or representation regarding Hazardous Materials, Environmental Conditions, Environmental Laws, the Permits and Regulations shall be limited to an aggregate of $11,000,000.

It is agreed that should Buyer or USA Waste withhold amounts which are otherwise due to Seller under this Agreement based upon an invalid assertion that Seller has breached a warranty or representation relating to Hazardous Materials, Environmental

Conditions, Environmental Laws, the Permits or Regulations, Seller shall suffer consequential damages which are in addition to the withheld amounts and the default interest and costs which Seller is entitled to recover under this Agreement, which consequential damages would be difficult if not impossible to measure; therefore, it is agreed that should Seller be the prevailing party against Buyer or USA Waste in litigation involving the withholding of funds due to Seller based on such an assertion, Seller (in addition to all other amounts owing to Seller under this Agreement) shall be entitled to recover from USA Waste, as liquidated consequential damages, 15% of the amounts which were wrongly withheld from Seller.

Section 12.5. Procedure for Indemnification with Respect to Third Party Claims. (a) If any third party shall notify a party to this Agreement (the "Indemnified Party") with respect to any matter (a "Third Party Claim") that may give rise to a claim for indemnification against any other party to this Agreement (the "Indemnifying Party") or if any party who may make a claim for indemnification under this Agreement otherwise becomes aware of any matter that may give rise to such a claim or wishes to make such a claim (whether or not related to a Third Party Claim), then the Indemnified Party shall promptly notify each Indemnifying party thereof in writing; provided, however, that no delay on the part of the Indemnified Party in notifying any Indemnifying Party shall relieve the Indemnifying Party from any obligation hereunder. unless (and then solely to the extent) the Indemnifying Party is thereby prejudiced.

(b) Any Indemnifying Party will have the right to defend the Indemnified Party against a Third Party Claim with counsel of its choice satisfactory to the Indemnified Party so long as (i) the Indemnifying Party notifies the Indemnified Party in writing within a reasonable time after the Indemnified Party has given notice of the Third Party Claim that the Indemnifying Party will indemnify the Indemnified Party from and against the entirety of any adverse consequences (which

will include, without limitation, all losses, claims, liens, and attorneys' fees and related expenses) the Indemnified Party may suffer resulting from, arising out of, relating to, in the nature of, or caused by the Third Party Claim, (ii) the Indemnifying Party provides the Indemnified Party with evidence acceptable to the Indemnified Party that the Indemnifying Party will have the financial resources to defend against the Third Party Claim and fulfill its indemnification obligations hereunder, (iii) the Third Party Claim involves only monetary damages and does not seek an injunction or equitable relief or involve the possibility of criminal sanctions, (iv) settlement of, or adverse judgment with respect to the Third Party Claim is not, in the good faith judgment of the Indemnified Party, likely to establish a precedential custom or practice adverse to the continuing business interests of the Indemnified Party, and (v) the Indemnifying Party conducts the defense of the Third Party Claim actively and diligently.

(c) So long as the Indemnifying Party is conducting the defense of the Third Party Claim in accordance with Section 12.5(b) above, (i) the Indemnified Party may retain separate co-counsel at its sole cost and expense and participate in the defense of the Third Party Claim, (ii) the Indemnified Party will not consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of the Indemnifying Party (which will not be unreasonably withheld) and (iii) the Indemnifying Party will not consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of the Indemnified Party (which will not be unreasonably withheld).

(d) In the event or to the extent that any of the conditions set forth in Section 12.5(b) above is or becomes unsatisfied, however, (i) the Indemnified Party may defend against, and consent to the entry of any judgment or enter into any settlement with respect to, the Third Party Claim and

any matter it may deem appropriate in its sole discretion and the Indemnified Party need not consult with, or obtain any consent from, any Indemnifying Party in connection therewith (but will keep the Indemnifying Party reasonably informed regarding the progress and anticipated cost thereof), (ii) the Indemnifying Party will reimburse the Indemnified Party promptly and periodically for the cost of defending against the Third Party Claim (including attorneys' fees and expenses), (iii) the Indemnifying Party will remain responsible for any adverse consequences the Indemnified Party may suffer resulting from, arising out of, relating to, in the nature of, or caused by the Third Party Claim to the fullest extent provided in this Article 12, and (iv) the Indemnifying Party shall be deemed to have waived any claim that its indemnification obligation should be reduced because of the manner in which the counsel for the Indemnified Party handled the Third Party Claim.

## ARTICLE 13. TERMINATION OF AGREEMENT

Section 13.1. Termination by Buyer. Buyer, by notice in the manner hereinafter provided on or before the Closing Date, may terminate this Agreement in the event of a breach by Seller in the observance or in the due and timely performance of any of the agreements or conditions contained herein on their part to be performed, and such breach shall not have been cured on or before the Closing Date.

Section 13.2. Termination by Seller. Seller may, by notice in the manner hereinafter provided on or before the Closing Date, terminate this Agreement in the event of a breach by Buyer in the observance or in the due and timely performance of any of the covenants, agreements or conditions contained herein on its part to be performed, and such breach shall not have been cured on or before the Closing Date.

Section 13.3. Termination by Any Party. If the parties have been unable to satisfy the contingencies and preconditions to the Closing of this transaction on or before June 30, 1997, Buyer

and USA Waste may give notice to Seller or Seller may give notice to Buyer and USA Waste that this Agreement is terminated.

Section 13.4. Effect of Termination. In the case of termination of this Agreement by reason of action taken under either Section 13.1 or Section 13.2, the termination shall be without prejudice to any rights or remedies which the aggrieved party may have under this Agreement or under law or equity by reason of the failure of the other party which gave rise to the termination. In the case of termination under Section 13.3, except as expressly provided to the contrary in this Agreement, Seller, Buyer and USA Waste shall have no further rights, duties, obligations or liabilities under this Agreement.

## ARTICLE 14. NONDISCLOSURE OF CONFIDENTIAL INFORMATION

Section 14.1. Nondisclosure by Seller. Seller recognizes and acknowledges that it had in the past, currently has, and in the future may possibly have, access to certain confidential information of Buyer, such as lists of customers, operational policies, and pricing and cost policies that are valuable, special and unique assets of Buyer and its businesses. Seller agrees that unless such information becomes known to the general public through no fault of Seller, it will not disclose such confidential information to any person, firm, corporation, association or other entity for any purpose or reason whatsoever, except to authorized representatives of Buyer, without Buyer's prior written consent, except as may be required by Environmental Laws or other legal process. In the case of a disclosure required by Environmental Laws or other legal process, Seller shall make no disclosure without prior written notice to Buyer. In the event of a breach or threatened breach by Seller of the provisions of this Section, Buyer shall be entitled to an injunction restraining Seller from disclosing, in whole or in part, such confidential information. Nothing herein shall be construed as prohibiting Buyer from pursuing any other available remedy for such breach or threatened breach, including, without limitation, the recovery of damages. The provisions of this Section shall apply at all times prior to

the Closing Date and for a period of one year following the Closing.

Section 14.2. Nondisclosure by Buyer. Buyer recognizes and acknowledges that it has in the past, currently has, and prior to the Closing Date, will have access to certain confidential information of Seller, such as lists of customers, operational policies, and pricing and cost policies that are valuable, special and unique assets of Seller. Buyer agrees that, unless such information becomes known to the general public through no fault of Buyer, it will not disclose such confidential information to any person, firm, corporation, association, or other entity for any purpose or reason whatsoever, prior to the Closing Date without Seller's prior written consent, except as may be required by Environmental Laws or other legal process. In the case of a disclosure required by Environmental Laws or other legal process, Buyer shall make no disclosure without prior written notice to Seller. In the event of a breach or threatened breach by Buyer of the provisions of this Section, Seller shall be entitled to an injunction restraining such party from disclosing, in whole or in part, such confidential information. Nothing contained herein shall be construed as prohibiting Seller from pursuing any other available remedy for such breach or threatened breach, including, without limitation, the recovery of damages. The provisions of this Section shall apply at all times prior to the Closing Date and for a period of one year following the termination of this Agreement without a Closing having occurred.

## ARTICLE 15. FEDERAL SECURITIES ACT RESTRICTIONS ON STOCK

Section 15.1. Registered Stock. USA Waste represents and warrants to Seller and Seller acknowledges that all of the shares of USA Waste Stock to be delivered to Seller pursuant to this Agreement will be registered under the Act prior to delivery to Seller. USA Waste shall deliver to Seller a copy of the registration statement, as amended and as declared effective by the Securities and Exchange Commission, together with five copies of USA Waste's definitive prospectus. Prior to filing, USA Waste

shall provide Seller with copies of the proposed registration statement to allow Seller an opportunity to review any information contained therein regarding Seller and the transaction.

Section 15.2. Compliance with Law. USA Waste warrants and represents that none of the shares of USA Waste Stock will be subject to any restrictions on transfer, except restrictions imposed by the Act or the rules and regulations promulgated thereunder, and the said restrictions imposed by the Act or the rules and regulations promulgated thereunder shall not limit Seller's ability to resell any or all of such shares of USA Waste Stock on the Closing Date or at any time thereafter except for the provisions requiring a broker transaction.

Section 15.3. General Legend. All USA Waste Stock shall bear the following legend:

**THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO THE PROVISIONS OF RULE 145(D) PROMULGATED UNDER THE SECURITIES ACT OF 1933, AND MAY NOT BE TRANSFERRED OR DISPOSED OF BY THE HOLDER WITHOUT COMPLIANCE WITH SAID RULE.**

## ARTICLE 16. GENERAL

Section 16.1. Certain Definitions.

(a) The "Review Period" means that period which commenced as of the meeting of Buyer and Seller on December 4, 1996, and shall continue through the Friday which next precedes the date of Closing.

(b) "Environmental Laws" means all common law, as well as federal, state and local laws, including statutes, regulations, ordinances, codes, rules, orders, directives and other governmental restrictions and requirements (including, but not limited to, those contained in or evidenced by permits, temporary permits or exemption letters) relating to the discharge of air pollutants, water pollutants, solid wastes or process waste water or otherwise relating to the environment, hazardous wastes, materials or substances, toxic substances, asbestos or any process of Seller that has an impact on the environment, including, but not limited to, the Federal Solid Waste Disposal Act, the Federal Clean Air Act,

the Federal Clean Water Act, the Federal Resource Conservation and Recovery Act of 1976, the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), Toxic Substances Control Act, Federal Water Pollution Control Act, National Environmental Policy Act, Federal Occupational Safety and Health Act, regulations of the Environmental Protection Agency, regulations of Nuclear Regulatory Agency, or any applicable federal, state or local regulatory or administrative agency with authority over natural resources or environmental protection, now in effect or at any time hereinafter promulgated.

(c) "Environmental Condition" means any known or unknown physical condition or state, event or occurrence which is governed by or within the scope of Environmental Laws.

<u>Section 16.2</u>. <u>Assignment; Binding Effect; Amendment</u>. This Agreement and the rights of the parties hereunder may not be assigned (except by operation of law) and shall be binding upon and shall inure to the benefit of the parties hereto, the successors of Buyer and Seller. This Agreement, upon execution and delivery, constitutes a valid and binding agreement of the parties hereto enforceable in accordance with its terms and may be modified or amended only by a written instrument executed by all parties hereto.

<u>Section 16.3</u>. <u>Obligations of Buyer and USA Waste</u>. (a) The obligations of USA Waste to Seller in regard to: (i) the purchase price under Section 2.1, including both the payment of the money due at closing and the delivery of the USA Waste Stock; (ii) the payment of the Additional Deferred Purchase Price, default interest and collection costs under Section 2.2; (iii) the warranty contained in Section 7.2; (iv) the warranty of the corporate authority of USA Waste contained in Section 7.3; (v) the warranty of binding effect, validity of obligations and enforceability as to USA Waste contained in Section 7.6; (vi) the warranties and representations of USA Waste under Article 15; and (vii) the agreement by USA Waste to pay default interest and costs of litigation contained in

Section 16.18, are primary obligations of USA Waste to Seller as are the indemnity obligations contained in Section 12.3 insofar as the said indemnity obligations pertain to the said primary obligations of USA Waste under this Agreement. The said primary obligations of USA Waste are referred to herein as the "Primary Obligations of USA Waste". Buyer guarantees to Seller the due and timely performance of all of the Primary Obligations of USA Waste. The obligations of Buyer to Seller as guarantor for USA Waste are Referred to herein as the "Guarantee Obligations of Buyer".

(b) All of the obligations undertaken by Buyer and USA Waste to Seller under this Agreement which are not identified in Section 16.3(a) above, as being the Primary Obligations of USA Waste are the primary obligations of Buyer to Seller as are the indemnity obligations contained in Section 12.3 insofar as the said indemnity obligations pertain to the said primary obligations of Buyer under this Agreement. The said primary obligations of Buyer are referred to herein as the "Primary Obligations of Buyer". USA Waste guarantees to Seller the due and timely performance of all of the Primary Obligations of Buyer. The obligations of USA Waste to Seller as guarantor for Buyer are referred to herein as the "Guarantee Obligations of USA Waste".

(c) As used in this Section 16.3(c), "Guarantor" means USA Waste in reference to the Guarantee Obligations of USA Waste and means Buyer in reference to the Guarantee Obligations of Buyer. "Primary Obligor" means USA Waste in reference to the Guarantee Obligations of Buyer and means Buyer in reference to the Guarantee Obligations of USA Waste. Buyer and USA Waste agree that:

(i) The obligations of Guarantor to Seller shall be unconditional and independent of any liability of the Primary Obligor.

(ii) In the event that the Primary Obligor fails to make any required payment or perform any of its obligations under the Agreement, and such failure

continues beyond any notice period required by the terms of the Agreement, the Guarantor shall be liable to Seller for such payment or performance.

(iii) Following a default by the Primary Obligor which is not cured within the time specified in any default notice required by the terms of the Agreement, a separate action or actions may be brought or prosecuted against the Guarantor, whether such action is brought against the Primary Obligor or whether the Primary Obligor is joined in such action or actions.

(iv) The Guarantor authorizes Seller, without notice or demand to the Guarantor, and without affecting its liability hereunder, from time to time to (A) waive any terms of the Agreement, (B) take and hold security for the payment of the Guarantee Obligations provided by the Primary Obligor, and exchange, enforce, waive, subordinate or release any such security, and (C) apply such security and direct the order or manner of sale of such security as Seller, in its discretion, may determine.

(v) The Guarantor waives any right to require Seller to proceed against the Primary Obligor, proceed against or exhaust any security held from the Primary Obligor, or pursue any other remedy in Seller's power whatsoever. The Guarantor waives any defense arising by reason of any disability or other defense of the Primary Obligor, or by reason of the cessation from any cause whatsoever of the liability of Primary Obligor. Until all obligations of the Primary Obligor to Seller have been satisfied in full, the Guarantor shall have no right of subrogation and waives any right to enforce any remedy which Seller now has or may hereafter have against the Primary Obligor, and waives any benefit of, and any right to participate in any security now or hereafter held by Seller. The Guarantor waives all presentments, demands for performance, notices of nonperformance, notices of

acceptance of this Guarantee and the existence, creation or incurring of new or additional indebtedness.

(vi) The Guarantor agrees to pay Seller's reasonable attorneys' fees and all other costs and expenses which may be incurred by Seller in any enforcement of the guarantee obligations of Guarantor hereunder in which Seller prevails in accordance with the terms of Section 16.18.

(vii) No action which Seller may take or omit to take in connection with the Agreement, excluding willful misconduct, nor any course of dealing with the Primary Obligor or any other person shall release the Guarantor's obligations hereunder, affect the Agreement in any way or afford the Guarantor any recourse, claims, or offsets against Seller.

(viii) The Guarantor agrees that Seller shall have no duty to disclose to the Guarantor any information it receives regarding the financial status of the Primary Obligor, whether or not such information indicates that the risk that the Guarantor may be required to assume hereunder has been or may be increased. The Guarantor assumes full responsibility for being and keeping informed on all such matters.

(ix) The guarantee obligations of Guarantor shall continue so long as any obligation from Primary Obligor to Seller remains, including the obligation of indemnification under Article 12 of the Agreement. The guarantee obligations of Guarantor shall be binding upon Guarantor and its successors and assigns and shall inure to the benefit of Seller, its officers and directors and its successors and assigns permitted under the terms of the Agreement. If any guarantee obligation of Guarantor is deemed to be invalid or inoperative for any reason, that part shall be deemed modified to the extent necessary to make it valid and operative or if it cannot be so modified, then severed, and the remainder of the

obligations of Guarantor shall continue in force and effect as if it had been signed with the invalid portion so modified or eliminated.

Section 16.4. Third Party Beneficiary. The parties agree that no person or entity shall be a third party beneficiary to this Agreement.

Section 16.5. Entire Agreement. This Agreement is the final, complete and exclusive statement and expression of the agreement among the parties hereto with relation to the subject matter of this Agreement, it being understood that there are no oral representations, understandings or agreements covering the same subject matter as this Agreement. This Agreement supersedes, and cannot be varied, contradicted or supplemented by evidence of any prior or contemporaneous discussions, correspondence, or oral or written agreements of any kind.

Section 16.6. Counterparts. This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute but one and the same instrument.

Section 16.7. No Brokers. Seller represents and warrants to Buyer and Buyer represents to Seller that the warranting party has had no dealings with any broker or agent so as to entitle such broker or agent to a commission or fee in connection with the within transaction. If for any reason a commission or fee shall become due, the party dealing with such agent or broker shall pay such commission or fee and agrees to indemnify and save harmless each of the other parties from all claims for such commission or fee and from all attorneys' fees, litigation costs and other expenses relating to such claim.

Section 16.8. Expenses of Transaction. Whether or not the transactions herein contemplated shall be consummated: (i) Buyer will pay the fees, expenses and disbursements of Buyer and its agents, representatives, accountants and counsel incurred in connection with the subject matter of this Agreement and any amendments hereto and all other costs and expenses incurred in the performance and compliance with all conditions to be performed by

Buyer under this Agreement; and (ii) Seller will pay personally the fees, expenses and disbursements of Seller and their respective agents, representatives, accountants and counsel incurred in connection with the subject matter of this Agreement and any amendments hereto and all other costs and expenses incurred in the performance and compliance with all conditions to be performed by Seller under this Agreement. All such fees, expenses and disbursements of Seller shall be paid by Seller prior to the Closing so that the Assets will not be charged with or diminished by any such fee, cost or expense. Seller represents and warrants to Buyer that Seller has relied on its own advisors for all legal, accounting, tax or other advice whatsoever with respect to this Agreement and the transactions contemplated hereby.

Section 16.9. Notices. All notices or other communications required or permitted hereunder shall be in writing and may be given by depositing the same in United States mail, addressed to the party to be notified, postage prepaid and registered or certified with return receipt requested, by overnight courier or by delivering the same in person to such party.

(a) If to Buyer, addressed to it at:

Burnsville Sanitary Landfill, Inc.
Park West Two
Suite 420
200 Cliff Mine Road
Pittsburgh, PA 15275
ATTN: Regional Vice President

with a copy to:

USA Waste Services, Inc.
1001 Fannin Street
Suite 4000
Houston, Texas 77002
Attn: General Counsel

and a copy to:

Elaine A. Chotlos, Esq.
Baker & Hostetler LLP
3200 National City Center
Cleveland, Ohio 44114-3485

(b) If to Seller, addressed to it at:

Edward Kraemer & Sons, Inc.
One Plainview Road
Plain, WI 53577
Attn: David R. Kraemer

with a copy to:

Ronald Todd, Esq.
Stroud, Stroud, Willink, Thompson and Howard
25 W. Main Street, Suite 300
Madison, Wisconsin 53701

Notice shall be deemed given and effective the day personally delivered, the day after being sent by overnight courier, subject to signature verification, and three business days after the deposit in the U.S. mail of a writing addressed as above and sent first class mail, certified, return receipt requested, or when actually received, if earlier. Any party may change the address for notice by notifying the other parties of such change in accordance with this Section.

Section 16.10. Governing Law. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Minnesota, without giving effect to any choice or conflict of law provision or rule (whether of the State of Minnesota or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Minnesota.

Section 16.11. Appointment of Agent. Seller agrees that it will maintain a registered agent in the State of Minnesota to accept and acknowledge service of process. Each party agrees that service of process or notice in any such action, suit or proceeding shall be effective if in writing and delivered to the address provided in Section 16.9 for such party, in the manner prescribed in such Section.

Section 16.12. No Waiver. No delay of or omission in the exercise of any right, power or remedy accruing to any party as a result of any breach or default by any other party under this Agreement shall impair any such right, power or remedy, nor shall

it be construed as a waiver of or acquiescence in any such breach or default, or of or in any similar breach or default occurring later; nor shall any waiver of any single breach or default be deemed a waiver of any other breach of default occurring before or after that waiver.

Section 16.13. Time of the Essence. Time is of the essence of this Agreement.

Section 16.14. Captions. The headings of this Agreement are inserted for convenience only, shall not constitute a part of this Agreement or be used to construe or interpret any provision hereof.

Section 16.15. Severability. In case any provision of this Agreement shall be invalid, illegal or unenforceable, it shall, to the extent possible, be modified in such manner as to be valid, legal and enforceable but so as most nearly to retain the intent of the parties. If such modification is not possible, such provision shall be severed from this Agreement. In either case the validity, legality and enforceability of the remaining provisions of this Agreement shall not in any way be affected or impaired thereby.

Section 16.16. Construction. The parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement. Any reference to any federal, state, local or foreign statute shall be deemed to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. The word "including" means including, without limitation. The parties intend that representation, warranty and covenant contained herein shall have independent significance. If any party has breached any representation, warranty or covenant contained herein in any respect, the fact that there exists another representation, warranty or covenant relating to the same subject matter

(regardless of the relative levels of specificity) that the party has not breached shall not detract from or mitigate the fact the party is in breach of the first representation, warranty or covenant.

Section 16.17. Standstill Agreement. Unless and until this Agreement is terminated pursuant to Article 13 hereof without the Closing having taken place, Seller will not directly or indirectly solicit offers for the stock or the assets of Seller or for a merger or consolidation involving Seller, or respond to inquiries from, share information with, negotiate with or in any way facilitate inquiries or offers from, third parties who express or who have heretofore expressed an interest in acquiring Seller by merger, consolidation or other combination or acquiring any of the Assets of Seller.

Section 16.18. Interest; Costs of Litigation. (a) Any party which fails to make a required payment when due under the terms of this Agreement shall pay to the party entitled to the payment interest at the rate of 12% per annum from the date the payment was due until the date paid.

(b) In addition, in any litigation brought by a party over the terms of this Agreement, including, without limitation, failure to make required payments, the prevailing party shall be entitled to receive, as part of its damages, all of its costs and expenses of such litigation, including, without limitation, attorneys' fees and expenses, investigation costs and court costs.

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed as of the day and year first above written.

BUYER:

BURNSVILLE SANITARY LANDFILL, INC.

By: ____________________
Its: Assistant Sec.

SELLER:

EDWARD KRAEMER & SONS, INC.

By: ______________________
Its: ______________________

USA WASTE SERVICES, INC.

By: ______________________
Its: Assistant Sec.

Section 8.2(i) proceed with diligence with the design, construction, and final regulatory approvals of the 7-acre cell permitted to accept demolition and construction material including fine grading, liner, leachate piping and filter sand. In addition to amounts owing to Seller at Closing under Section 2.2, USA Waste shall pay at Closing to Seller the Seller's cost of this work up to $175,000.00.

**LIST OF ATTACHMENTS:**

**Book I (Red)**

1. **Exhibit A**. The Land and Easements.

2. **Schedule 1.1(b)**. This Schedule Includes the Licenses and Permits Which Have Been Assembled as of the Signing of this Agreement. It Will Be Supplemented During the Review Period and Finalized at Closing.

3. **Schedule 1.1(c)**. Equipment.

4. **Schedule 1.1(d)**. Motor Vehicles.

5. **Schedule 1.1(e)**. Billing and Computer Systems.

6. **Schedule 1.1(h)**. This Schedule Includes the Customer Contracts Which Have Been Assembled as of the Signing of this Agreement. It Will Be Supplemented During the Review Period and Finalized at Closing.

7. **Schedule 1.3**. This Schedule Includes the Customer Contracts Which Require Consent of a Third-party for Transfer. It Will Be Compiled During the Review Period and Finalized at Closing.

8. **Schedule 1.4**. Accounts Receivable.

9. **Schedule 4.4**. Composting Equipment.

10. **Schedule 6.1**. Articles and Bylaws of Seller.

**Book II (White)**

11. **Schedule 6.3**. Seller Names.

12. **Schedule 6.4**. Seller Subsidiaries.

13. **Schedule 6.5**. Seller Financial Statements and Statement of Differences from GAAP.

14. **Schedule 6.6**. Non-Balance Sheet Liabilities.

15. **Schedule 6.7**. Proprietary Rights.

16. **Schedule 6.8(iii)**. Leased Assets.

17. Schedule 6.11. This Schedule Includes the Insurance Policies. It Will Be Supplemented and Updated During the Review Period and Finalized at Closing.

18. Schedule 6.12. Landfill Employees and Compensation.

19. Schedule 6.13. This Schedule Includes the Employee Agreements and Benefit Plans. It Will Be Supplemented and Updated During the Review Period and Finalized at Closing.

20. Schedule 6.15. Conflicts with Existing Agreements.

21. Schedule 6.17. Litigation and Disputes Against Seller.

22. Schedule 10.10. This Schedule Includes an Updating of Customer Contracts. It Will Be Complied During The Review Period And Finalized at Closing.

23. Schedule 11.2(d)-x. PUD Agreement.

24. Schedule 11.2(d)-y. Assessment Agreement.

25. Schedule 11.2(d)-z. Assessment Amortization Schedule.

## Book III (Blue)

26. Supplemental Schedule. This Schedule Includes the Minnesota Methane Agreement, the Northwest Bituminous Lease and the Cargill Agreement. It Will Be Supplemented During the Review Period to Include Any Agreements Which the Buyer and Seller Wish to Make Part of the Exhibits to Their Agreement.

27. Annex I. This Annex Includes an Amortization Schedule Which Divides the Additional Deferred Purchase Price under Section 2.2 Between Interest (Computed at the Mid-Term Applicable Federal Rate on the Date of this Agreement) and Principal. It Will Be Complied During the Review Period and Finalized at Closing.

28. Annex II. This Annex Identifies the Historical Information. It Will Be Complied During the Review Period and Finalized at Closing.